**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1854**

DAMIEN DONOVAN WILLIAMS, a/k/a Damian Donavan Williams,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: December 7, 2021 Decided: November 16, 2022

Before RUSHING, Circuit Judge, and MOTZ and FLOYD, Senior Circuit Judges.

Petition for review granted, vacated, and remanded by published opinion. Senior Judge Floyd wrote the opinion in which Senior Judge Motz joined. Judge Rushing wrote a separate dissenting opinion.

**ARGUED:** Benjamin Ross Winograd, IMMIGRANT & REFUGEE APPELLATE CENTER, LLC, Alexandria, Virginia, for Petitioner. Lindsay Colbert Dunn, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Jeffrey Bossert Clark, Acting Assistant Attorney General, Brian Boynton, Acting Assistant Attorney General, John S. Hogan, Assistant Director, Kiley Kane, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

FLOYD, Senior Circuit Judge:

In 2006, the Department of Homeland Security (DHS) deported Petitioner Damien Donovan Williams, a permanent resident of the United States since he was six years old, because the Board of Immigration Appeals (BIA or the Board) deemed his altercation with the police an aggravated felony. Because of that designation, Williams was not allowed back into the United States, not even to visit. He would spend the next eleven years in Jamaica, working mostly for room and board, his U.S.-citizen mother, siblings, girlfriend, and children affording only a handful of trips to see him. In 2018, the Supreme Court ruled that the type of offense Williams committed no longer qualified as an aggravated felony. Learning of that decision in 2019, Williams moved the BIA to reconsider its original removal order and to equitably toll the usual thirty-day deadline for filing such motions in view of the legal change. The BIA declined. It did not dispute that Williams is entitled to be readmitted into the country, but it rejected Williams's request to toll the limitations period, believing him insufficiently diligent in discovering his rights.

We cannot agree with that result. We hold that we have jurisdiction to review the BIA's decision and that we must review it de novo. And we vacate the Board's diligence determination, remanding to the BIA to consider the second prong of the equitable-tolling inquiry—whether the change in the law constituted an extraordinary circumstance—as well as the merits of Williams's claim.

I.

A.

Under the Immigration and Nationality Act (INA), noncitizens[1] who commit certain crimes become removable from the United States. 8 U.S.C. § 1227(a)(2)(A). When noncitizens are permanent residents, however, they may ask the Attorney General to cancel their removal to avoid causing "exceptional and extremely unusual hardship" to their families—but only if they did not commit an aggravated felony. *Id.* § 1229b(a)(3), (b)(1)(D). Noncitizens who did, even permanent residents, face swift and enduring consequences. They receive only abbreviated judicial review, with the courts entertaining only legal and constitutional—but not factual—challenges to "the final order of removal." *Id.* § 1252(a)(2)(C)–(D). And they can never return to the United States. They become, in the immigration parlance, permanently "inadmissible." *Id.* § 1182(a)(9)(A)(ii).

When the DHS brought removal proceedings against Williams in 2005, the INA defined "aggravated felony" to include all "crime[s] of violence" specified in 18 U.S.C. § 16 punishable by imprisonment of at least one year. Section 16, in turn, defined crimes of violence in two ways: "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another" and a felony

[1] We use "noncitizen" in place of the statutory "alien," which has been recognized as an "archaic and dehumanizing" term. Maria Sacchetti, *ICE, CBP to Stop Using 'Illegal Alien' and 'Assimilation' Under New Biden Administration Order*, Wash. Post (Apr. 19, 2021), https://www.washingtonpost.com/immigration/illegal-alien-assimilation/2021/04/19/9a2f878e9ebc-11eb-b7a8-014b14aeb9e4_story.html; *see also, e.g.*, *Nasrallah v. Barr*, 140 S. Ct. 1683, 1689 n.2 (2020).

"that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of" the offense. 18 U.S.C. § 16(a)–(b).

In the years following Williams's removal, the Supreme Court and the BIA twice refashioned § 16's definitions. First, in 2010, the Court held that "physical force" must mean "violent force"—"force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 139–40 (2010). And applying *Johnson*, the BIA determined that offenses which by their terms encompass the "slightest touching of another" no longer qualify as crimes of violence under § 16(a). *In re Velasquez*, 25 I. & N. Dec. 278, 282–83 (BIA 2010).[2] Second, in 2018, the Court struck § 16(b) as unconstitutionally vague on its face. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1223 (2018). Taken together, these decisions permit the DHS to remove noncitizens for committing an aggravated felony only upon proof of violent force.

Noncitizens so removed may ask the agency to reopen or reconsider the order. A motion to reopen recites "new facts" not previously available, while a motion to reconsider

[2] In determining whether an offense qualifies as a crime of violence, courts apply a categorical approach, meaning they "consider only the elements of the statute of conviction rather than the defendant's conduct underlying offense." *Omargharib v. Holder*, 775 F.3d 192, 196 (4th Cir. 2014). Occasionally, courts consider statutes "divisible" because they "set forth multiple crimes, with varying elements—and some of the crimes set forth therein would pass the categorical inquiry if examined on their own." *Bah v. Barr*, 950 F.3d 203, 206 (4th Cir. 2020) (citation omitted). In such cases, courts modify the categorical approach "to determine what crime, with what elements, a defendant was convicted of." *Id.* at 207 (citation omitted). Either way, courts "focus on the elements, rather than the facts, of a crime" because "Congress predicated deportation on convictions, not conduct." *Id.* at 206–07 (citations omitted). Thus, the BIA's ruling: Offenses that encompass mere offensive touching categorically cannot satisfy §16(a)'s definition of a crime of violence and, correspondingly, cannot confer a basis for removal.

specifies "errors of law or fact in the previous order." 8 U.S.C. § 1229a(c)(6)(C), (7)(B). Noncitizens may file one of each. They have thirty days to request reconsideration and ninety to move to reopen. *Id.* § 1229a(c)(6)(B), (7)(C). If the BIA declines, noncitizens may petition the appropriate court of appeals. But courts will not review the underlying removal order by that same petition; noncitizens must file "separate petitions" laying out errors in those separate decisions. *Stone v. INS*, 514 U.S. 386, 395 (1995).

B.

Damien Donovan Williams is a native and citizen of Jamaica. He moved to the United States in July 1987, when he was just six years old, and became a permanent resident in October of that same year. His mother, three of his four siblings, his long-term girlfriend (now wife), and his four children are all U.S. citizens.

In February 2003, Williams was convicted of assault and battery of a police officer, obstructing justice, disorderly conduct, and failure to appear under Virginia law. *See* Va. Code Ann. §§ 18.2-57(C), 18.2-460, 18.2-415, 19.2-128. The three substantive offenses arose out of a single incident, when Williams resisted an officer's spraying him with mace after he was already in handcuffs. Williams then failed to appear because of conflicting court dates: he was in one courtroom when he was called in another.

In September 2005, the DHS initiated removal proceedings, contending Williams was removable for having committed both an aggravated felony—the assault and battery on the police officer—and two crimes involving moral turpitude (CIMTs)—the same assault and battery and the failure to appear. *See* 8 U.S.C. § 1227(a)(2)(A)(ii)–(iii) (listing

aggravated felony and multiple CIMTs as separate grounds for removability). Williams had trouble retaining a pro bono attorney, even with the four continuances the immigration judge (IJ) allowed. But during the fifth hearing, an attorney sitting in the courtroom agreed to take on his case. With this attorney's help, Williams denied removability and asked the IJ to terminate the proceedings. The IJ agreed Williams's conviction did not rise to an aggravated felony but still ruled him removable for committing two CIMTs.

Williams then requested cancellation of removal. The government maintained that Williams committed an aggravated felony, rendering him ineligible, but did not otherwise oppose his request. After a hearing, the IJ issued a short oral decision allowing Williams to stay. The government appealed to the BIA, arguing once more that Williams's assault on the officer amounted to an aggravated felony, and this time, the agency agreed. It determined the assault qualified as a crime of violence under both §§ 16(a) and (b). Williams never appealed the IJ's CIMT decision—it did not affect his ability to request cancellation of removal—but he did file a motion to reconsider the BIA's aggravated-felony ruling, which the BIA denied. Williams's attorney then ended his representation, leaving Williams to petition this Court pro se. We denied the petition, *Williams v. Gonzales*, 234 F. App'x 113 (4th Cir. 2007), and the DHS deported Williams to Jamaica.

As discussed, in the ensuing years, the Court decided *Johnson* and *Dimaya*, and the BIA applied *Johnson* to battery offenses that include the mere touching of another—indeed, the very offense of which Williams was convicted, Va. Code Ann. § 18.2-57. But Williams remained unaware. As he would later explain in an affidavit to the BIA, he worked as a groundskeeper in exchange for room and board and served as a maintenance

man on weekends, earning only about $20 per job. He had no access to the Internet. And his only pro bono lawyer had long cut all ties. Williams's family, themselves earning only about $20,000 per year, barely managed to visit him in Jamaica and did not have the funds to repeatedly hire attorneys to check whether the law had changed.

In 2019, Williams was finally able to marry his girlfriend, Lawaren Person. The same year, unfortunately, the lung disease Person had previously kept in check aggravated significantly, and Person's doctors advised her against spending time in polluted countries like Jamaica. Out of desperation, Person consulted an immigration attorney in April 2019 to determine if any avenues had opened up to allow her husband back in. The attorney requested Williams's file from the DHS under the Freedom of Information Act, which arrived towards the end of June 2019. Quickly appreciating the upshot of *Johnson* and *Dimaya*, she filed for reconsideration just one month later, in July 2019. She asked the BIA to either equitably toll the time and number limitations on Williams's motion or to reconsider sua sponte. In support of the application, Williams attached declarations from himself and Person explaining why his living conditions in Jamaica and her scarce wages in the United States had precluded them from retaining an attorney until 2019.

The government did not oppose Williams's motion, but the BIA still denied his request. It did not dispute that Williams's conviction no longer qualified as a crime of violence but declined to equitably toll the statutory limits, faulting Williams for failing to explain why he "had not regularly sought out pro bono counsel prior to April 2019 to stay informed on the status of the law" and why Person did not "assist him from the United States." A.R. 5. The Board also declined to reconsider sua sponte, again citing Williams's

nondiligence in ferreting out U.S. immigration law. Williams timely petitions for review of both rulings.[3]

II.

Before we can delve into the substance of the BIA's equitable-tolling decision, we must determine how much of it we have jurisdiction to review, what standard of review we should employ, and whether the statutory deadline for a motion to reconsider can be equitably tolled at all. We take these in turn, beginning here with jurisdiction.

As discussed, § 1252(a)(2)(C) prohibits courts of appeals to "review any final order of removal against an alien who is removable by reason of having committed" certain specified crimes, including aggravated felonies and multiple CIMTs. 8 U.S.C. § 1252(a)(2)(C). Both parties agree that if § 1252(a)(2)(C) applies, § 1252(a)(2)(D) nonetheless permits us to review "constitutional claims or questions of law." *Id.* § 1252(a)(2)(D). The parties also agree that questions of law include whether "the Board incorrectly applied the equitable tolling due diligence standard to the 'undisputed' (or established) facts." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068 (2020). But Williams resists this threshold determination. He argues § 1252(a)(2)(C) does not apply at all, that we have authority to review the BIA's factual errors, as well.

---

[3] In 2020, the Department of Justice amended 8 C.F.R. § 1003.2(a) to prohibit the BIA from reconsidering final orders of removal sua sponte except to correct ministerial errors, *see* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588, 81,591 (Dec. 16, 2020), but a federal court has since enjoined the implementation of the amendment nationwide, *see Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 928–29, 980 (N.D. Cal. 2021).

The only factual ruling in play concerns the BIA's determination that Williams's 2019 attorney offered her services pro bono. Williams contends the BIA reasoned from that (incorrect) conclusion that he could have found pro bono representation at any time, enabling him to monitor the immigration law through the years. And because he did not, he must not have acted diligently. But the fact was Person had to pay the attorney for her work. And that *undercuts* the BIA's diligence ruling: That Person spent money out of her impossibly tight budget demonstrates just how difficult it is to find a pro bono immigration attorney, even from inside the United States. This one factual issue may be modest in scope, but it breeds critical jurisdictional consequences for our future cases. In the end, we agree with Williams that the INA never meant to bar judicial review of collateral facts far removed from the underlying "final order of removal." 8 U.S.C. § 1252(a)(2)(C).

A.

In the deportation context, a "final order of removal" refers to an order "concluding that the alien is deportable or ordering deportation." *Nasrallah v. Barr*, 140 S. Ct. 1683, 1690 (2020) (quoting 8 U.S.C. § 1101(a)(47)(A)). That order becomes "final, and reviewable, when issued." *Stone*, 514 U.S. at 405. And its "finality is not affected by the subsequent filing of a motion to reconsider." *Id.* That is why, when we review the BIA's refusal to reconsider its removal decision, "the merits of the underlying" decision "are not before us." *Jean v. Gonzales*, 435 F.3d 475, 481 (4th Cir. 2006). To reach those merits, a noncitizen must file a "separate petition[ ] for review." *Stone*, 514 U.S. at 395. These are nonnegotiable, "jurisdictional" constraints. *Yurova v. Lynch*, 606 F. App'x 82, 83 (4th Cir.

2015) (citation omitted). But they also reflect common sense. It is "axiomatic" that before the BIA can reconsider a removal order, "there must *first* be an order of removal" to be reconsidered—especially where, as here, Williams was actually "removed pursuant to a valid order" twelve years ago. *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2284, 2287–88 (2021) (quoting *In re I-S-*, 24 I. & N. Dec. 432, 433 (BIA 2008)).

Still, it would blink reality to decline to review a factual challenge to the BIA's removal order only to then review "*that same*" challenge "dressed as a motion to reconsider." *Jean*, 435 F.3d at 481. And were we asked to decide factual questions that "affect the validity of the final order of removal"—such as, for example, whether and how Williams resisted arrest—we would certainly lack jurisdiction under § 1252(a)(2)(C). *Nasrallah*, 140 S. Ct. at 1691. But that is not what Williams asks us to do. He asks only that we correct the BIA's misconception that he successfully retained pro bono counsel when he finally moved for reconsideration. That conclusion was "adjunct" in every sense to the agency's prior "substantive" determination that Williams committed an aggravated felony and was therefore removable. *Kucana v. Holder*, 558 U.S. 233, 248 (2010); *Guzman Chavez*, 141 S. Ct. at 2287 (distinguishing "withholding-only proceedings" from "removal orders" because the two proceedings "address two distinct questions"). And indeed, we have already recognized our jurisdiction to consider such collateral factual matters, albeit without expressly tracing the source of that authority. Just two terms ago, we agreed to review the BIA's refusal to reconsider a final order removing a criminal noncitizen on grounds that the noncitizen's "new arguments were waived" and "that his request to present the additional evidence . . . was untimely." *Cucalon v. Barr*, 958 F.3d 245, 253–54 (4th

Cir. 2020). We did not once mention § 1252(a)(2)(C)'s jurisdictional bar in examining the BIA's reconsideration decision, even as elsewhere in the opinion we painstakingly explained that "we lack jurisdiction to review *an order of removal* based on an alien's conviction of an aggravated felony." *Id.* at 249 (emphasis added).

The Supreme Court confronted a similar challenge in *Nasrallah* and came to a similar conclusion. *Nasrallah* asked whether courts of appeals can review factual rulings underpinning Convention Against Torture (CAT) orders for criminal noncitizens or whether CAT orders merge into final orders of removal so that § 1252(a)(2)(C)'s limitations apply to CAT determinations, too. 140 S. Ct. at 1688. The Court held review appropriate, in part because, unlike the facts underlying the order of removal, factual "issues related to a CAT order will not typically have been litigated prior to the alien's removal proceedings" in any Article III court. *Id.* at 1693. And yet those issues, which "may range from the noncitizen's past experiences in the designated country of removal, to the noncitizen's credibility, to the political or other current conditions in that country," may be "critical to determining" the whole course of the noncitizen's future. *Id.* Congress, the Court reasoned, could not have intended to strip courts of jurisdiction over these collateral rulings when it barred "further relitigation of the underlying factual bases for those criminal convictions." *Id.*

And a jurisdictional bar would be doubly inappropriate here, where Williams's argument on the merits "would itself be reviewable." *Kucana*, 558 U.S. at 250. Williams argues that, as a matter of law, he can no longer be classed an aggravated felon after *Johnson* and *Dimaya*. Not only does § 1252(a)(2)(D) give us jurisdiction to review that

"question of law," *see Guevara-Solorzano v. Sessions*, 891 F.3d 125, 131 (4th Cir. 2018), but the government does not even dispute that Williams would succeed on it. And yet, the government's rule would leave us powerless to meaningfully review the BIA's threshold, procedural determination that cut short Williams's only hope of reuniting with his family. That cannot be what Congress had in mind when drafting § 1252(a)(2)(C).

B.

Longstanding exercise of judicial review of the Board's reconsideration decisions, the history of the relevant statutory provisions, the presumption favoring judicial review, and separation-of-powers concerns all reinforce this conclusion.

Motions to reconsider and reopen have long been understood to provide "an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings." *Kucana*, 558 U.S. at 242 (quoting *Dada v. Mukasey*, 554 U.S. 1, 18 (2008)). And federal-court review of these administrative decisions dates to at least 1916. *Id*. For the first eight of those decades, no statutory authority governed judicial review—Attorney General regulations first addressed reopening and reconsideration requests in 1941 and then again in 1958, when the BIA was established, but they, of course, said nothing of our jurisdiction to review them. *See id.* at 249 (citing New Regulations Governing the Arrest and Deportation of Aliens, 6 Fed. Reg. 68, 71–72 (Jan. 4, 1941); Miscellaneous Amendments to Chapter, 23 Fed. Reg. 9115, 9118–19 (Nov. 26, 1958)). It was not until 1996, when Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), that motions to reopen and reconsider took on a statutory

dimension. *See* 8 U.S.C. § 1229a(c)(6) (largely codifying the 1958 regulations). "In the same legislation, Congress amended the INA aggressively to expedite removal of aliens lacking a legal basis to remain in the United States," including by passing § 1252(a)(2)(C). *Kucana*, 558 U.S. at 249 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 475 (1999)). But it said nothing about extending § 1252(a)(2)(C) to our review of reopening and reconsideration motions, even though it could have easily "so specified together with its codification of directions on filing [those] motions." *Id.* at 250. Instead, "Congress left the matter where it was": The BIA has discretion to grant or deny such motions, and we "retain jurisdiction to review" all aspects of the BIA's decisions except where our review clearly conflicts with § 1252(a)(2)(C)'s core statutory aims. *Id.*; *accord Mata v. Lynch*, 576 U.S. 143, 148 (2015) (explaining that federal courts "have reviewed [reopening and reconsideration] decisions for nearly a hundred years" without express statutory directive and that IIRIRA "left that authority in place" (citing *Kucana*, 558 U.S. at 242–51)).[4]

---

[4] To be sure, in addition to our traditional authority, *Mata* also cited § 1252(b)(6), which consolidates "any review sought of a motion to reopen or reconsider" with "the review of the [underlying] order." 576 U.S. at 147–48 (cleaned up) (quoting 8 U.S.C. § 1252(b)(6)). But *Mata* cited the provision to illustrate only that Congress "expressly contemplate[d]" our jurisdiction to review BIA denials to reopen or reconsider—and left it unchanged—not to suggest that our only jurisdictional basis to review those denials flows from our authority to review final removal orders. *Id.* at 147. For if *Mata* believed *that*, it would not have reviewed the BIA's denial to equitably toll the limitations on a motion to reopen—removal orders, after all, do not implicate equitable tolling. *See also Nasrallah*, 140 S. Ct. at 1691 (rejecting the government's argument that CAT rulings merge into final removal orders because § 1252(b)(9) consolidates "all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States" with "judicial review of a final order" and holding instead that § 1252(b)(9) "simply establish[es] that a (Continued)

Any lingering doubt over our authority to review factual challenges to the BIA's denials to reopen or reconsider cannot survive the "familiar principle of statutory construction: the presumption favoring judicial review of administrative action." *Kucana*, 558 U.S. at 251. Because courts had already been consistently applying that presumption when Congress passed IIRIRA in 1996, *e.g.*, *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986), we can assume Congress "legislate[d] with knowledge of" that presumption. *Kucana*, 558 U.S. at 252 (quoting *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991)). So the statutory question becomes not whether IIRIRA *created* jurisdiction, but whether IIRIRA "clear[ly] and convincing[ly] . . . dislodge[d]" it. *Id.* (quoting *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993)). Because IIRIRA did no such thing, we continue to exercise our jurisdiction as we always have, reviewing even the factual challenges to BIA refusals to reopen and reconsider.

Foundational separation-of-powers considerations point us in the same direction. Congress well knew how to expressly delegate final authority over motions to reopen or reconsider to the Department of Justice. Where *it* has not done so, courts should not "place in executive hands authority to remove cases from the Judiciary's domain." *Id.* at 237; *accord Costello v. INS*, 376 U.S. 120, 127–28 (1964) (advising caution "before adopting a construction of [the statute] which would, with respect to an entire class of aliens, completely nullify a procedure so intrinsic a part of the legislative scheme"); *INS v. St. Cyr*, 533 U.S. 289, 320 (2001) (recognizing "the longstanding principle of construing any

---

CAT order may be reviewed together with the final order of removal" (quoting 8 U.S.C. § 1252(b)(9))).

lingering ambiguities in deportation statutes in favor of the alien" (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987))).[5]

C.

We are not alone in so understanding federal-court jurisdiction over the BIA's reopening and reconsideration decisions. The Ninth Circuit, for example, has accepted jurisdiction to review the agency's factfinding where the Board "did not rely on [a noncitizen's] conviction of a crime involving moral turpitude" but on its determination that the noncitizen had "not demonstrated a change in country conditions material to his claim for relief." *Agonafer v. Sessions*, 859 F.3d 1198, 1203 (9th Cir. 2017). The Fifth Circuit has gone even further, claiming jurisdiction to resolve "any factual questions necessary" to resolve questions of law. *Diaz v. Sessions*, 894 F.3d 222, 224–25, 227 & n.4 (5th Cir. 2018) (invoking §1252(a)(2)(D)'s command that "*nothing* shall preclude" judicial review of legal claims). And like this Court in *Cucalon*, the Eleventh Circuit has assumed authority to review collateral factual questions on petitions from motions to reopen and reconsider without any reference to the criminal-noncitizen bar. *See Abakporo v. U.S. Att'y Gen.*, No. 20-12750, 2021 WL 3598346, at *5–6 (11th Cir. Aug. 13, 2021); *Israel v. U.S.*

[5] We have previously suggested in a nonpublished, nonprecedential decision that final orders of removal subsume motions to reopen and reconsider, implicating the § 1252(a)(2)(C) bar. *Rangolan v. Mukasey*, 302 F. App'x 133, 136 (4th Cir. 2008). We reached that conclusion because we read § 1252(a)(1)—which confirms federal-court jurisdiction over "final orders of removal"—as providing "our only basis" to review such motions. *Id*. We now believe that a too-narrow interpretation after *Mata* and *Kucana*.

*Att'y Gen.*, 861 F. App'x 371, 374 (11th Cir. 2021), *cert. denied sub nom. Israel v. Garland*, No. 21-6352, 2022 WL 89583 (U.S. Jan. 10, 2022).

In the obverse, the Second Circuit has declined jurisdiction where the "orders are sufficiently connected that permitting review of a motion to reopen when § 1252(a)(2)(C) bars review of the final order of removal would provide an improper backdoor method of challenging a removal order." *Durant v. INS*, 393 F.3d 113, 115 (2d Cir. 2004), *as amended* (Feb. 1, 2005); *see also Santos-Salazar v. U.S. Dep't of Just.*, 400 F.3d 99, 103 (2d Cir. 2005) (declining to review the Board's denial of reconsideration, where petitioner asked the court to "revoke the final Order of deportation").

The through-line in these decisions demonstrates that courts of appeals look to the reasons the BIA gave when fixing the bounds of their jurisdiction. Where the Board finds the *substance* of a removal order makes reopening or reconsideration imprudent, the courts decline jurisdiction to avoid creating a "loophole" that "would thwart the clear intent of Congress that the courts not review" factual predicates to the agency's decisions to remove criminal noncitizens. *Jean*, 435 F.3d at 481 (quoting *Rodriguez v. Ashcroft*, 253 F.3d 797, 800 (5th Cir. 2001)). But where the BIA declines to reopen or reconsider in view of collateral issues, the courts have appropriately claimed jurisdiction to review.

Our own analysis of the neighboring § 1252(a)(2)(B), which strips federal courts of jurisdiction to review the agency's discretionary decisions, further counsels jurisdiction over the factual question here. In that context, we "examine the *basis for* the BIA's decision" to determine our jurisdiction because § 1252(a)(2)(B) "divests courts of jurisdiction only over BIA decisions that address the merits of an alien's request for relief

pursuant to those sections." *Obioha v. Gonzales*, 431 F.3d 400, 406 (4th Cir. 2005) (quoting *Stewart v. INS*, 181 F.3d 587, 595 (4th Cir. 1999)). In *Obioha*, for example, the Board declined to remand because a noncitizen "failed to seek cancellation of removal" before the IJ "when she had the opportunity to do so" and "failed to present the elements of prima facie eligibility for cancellation of removal in her motion" to remand. *Id.* at 407. We deemed those "procedural failure[s]" "unrelated to the merits of a discretionary decision on cancellation of removal" and proceeded to review. *Id.* We have upheld that approach since. *E.g.*, *Jean*, 435 F.3d at 481; *Sorcia v. Holder*, 643 F.3d 117, 126 (4th Cir. 2011); *Agidi v. Garland*, No. 20-2116, 2021 WL 5003416, at *1 (4th Cir. Oct. 28, 2021).

The same principle holds true here. Williams asked us to consider a factual challenge "unrelated to the merits" of the final removal order, *Obioha*, 431 F.3d at 407—or, put in *Nasrallah*'s words, a challenge that cannot "affect the validity of the final order of removal," 140 S. Ct. at 1691. We hold we have jurisdiction to resolve it.[6]

[6] Williams offers yet another jurisdictional basis. He proposes we begin by reviewing the agency's original determinations that Williams committed the aggravated felony and the two CIMTs. This Court has authority to do so, Williams asserts, because it always has jurisdiction "to determine whether a petitioner actually has triggered the statute's jurisdiction stripping provision." *Kporlor v. Holder*, 597 F.3d 222, 225 (4th Cir. 2010); *see also, e.g.*, *Guevara-Solorzano*, 891 F.3d at 131. If we agree he did not commit those crimes, Williams continues, § 1252(a)(2)(C) never comes into play at all. That analysis would be relatively straightforward as to Williams's aggravated-felony conviction—as discussed, not even the government disputes that *Johnson* and *Dimaya* compel that result. But the two CIMTs present a higher and perhaps insurmountable hurdle, for Williams never appealed the IJ's CIMT finding to the BIA. An argument can be made that we may consider an unexhausted claim for the limited purpose of determining our jurisdiction, but such a restricted approach would likely run afoul of the law-of-the-case doctrine. And our unpublished decisions have already declined to do so, albeit without considering this nuanced argument. *E.g.*, *Obomighie v. Holder*, 480 F. App'x 225, 227 (4th Cir. 2012). Because we find jurisdiction for other reasons, we do not reach this question.

III.

Also at the threshold, we must grapple with the standard of review. Both parties agree, as they must, that the ultimate "decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board." 8 C.F.R. § 1003.2. Federal courts of appeals have correspondingly "employed a deferential, abuse-of-discretion standard." *Kucana*, 558 U.S. at 242, 250; *see also Jean*, 435 F.3d at 483; *Lawrence v. Lynch*, 826 F.3d 198, 203 (4th Cir. 2016). And yet, argues Williams, the Supreme Court recently held that the specific question before us today—whether a petitioner exercised sufficient diligence to warrant equitable tolling—constitutes a "question of law." *Guerrero-Lasprilla*, 140 S. Ct. at 1068. Williams accordingly asks us to review that narrow, subsidiary question de novo. We agree with Williams, though not for the reasons he offers.

A.

The question presented in *Guerrero-Lasprilla* asked whether the term "questions of law" in § 1252(a)(2)(C) "includes the application of a legal standard to undisputed or established facts." 140 S. Ct. at 1067. The Court held it does, that all mixed questions of law and fact present questions of law for purposes of the jurisdictional bar. *Id.* Williams takes from that conclusion that equitable-tolling determinations require de novo review. But the Court predicated its decision on § 1252(a)(2)(C)'s "basic purpose of providing an adequate substitute for habeas review" as well as on the "traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Id.* at 1069, 1073 (citation omitted). The Court was also troubled that "interpreting the

Limited Review Provision to exclude mixed questions would effectively foreclose judicial review of the Board's determinations so long as it announced the correct legal standard." *Id.* at 1070. Those are uniquely jurisdictional concerns—much the same we just considered in Part II. They have to do with *whether*, not *how*, federal courts may review agency decisions. And the Court expressly declined to answer what its § 1252(a)(2)(C) holding means for "the proper standard for appellate review of a district, bankruptcy, or agency decision that applies a legal standard to underlying facts." *Id.* at 1069.

Admittedly, there is some tension in characterizing a question as legal when determining jurisdiction but as factual or discretionary when choosing the standard of review. But our own precedent, too, has drawn this distinction. *Cruz-Quintanilla v. Whitaker*, for example, concluded that government acquiescence in torture is a legal question when determining the standard of review but a factual one for purposes of federal-court jurisdiction. 914 F.3d 884, 889 (4th Cir. 2019) (citing *Saintha v. Mukasey*, 516 F.3d 243, 247–50 (4th Cir. 2008)). We reasoned the different outcomes possible because the two inquiries pursue different aims: The standard of review concerns competency and expertise, it asks, in essence, how prudent it would be to defer to the decisionmaker below, but § 1252(a)(2)(C) speaks to "the division of authority between the Executive and the judiciary." *Id.* at 891. *Guerrero-Lasprilla*, of course, has overruled *Cruz-Quintanilla*'s jurisdictional holding, as the ultimate question of whether a government acquiesces to torture involves "applying the law to decided facts." *Id.* at 890 (citation omitted). But its animating principle remains: A jurisdictional ruling does not mechanically translate into the standard of review; we must determine for ourselves which standard governs.

We begin with the common-sense principle that the Board's decision to decline reconsideration, discretionary as it is at day's end, usually builds upon a variety of subsidiary legal and factual conclusions. The Board may, for example, deny the motion because a noncitizen brings no new law to its attention. Or it may disagree with the noncitizen's interpretation of the new law, concluding he nonetheless lacks a legal path to relief. In still other cases, the Board may forego any determination as to the noncitizen's substantive entitlement to relief and decline to reconsider on procedural grounds. *See INS v. Abudu*, 485 U.S. 94, 104 (1988) (surveying the different reasons the BIA may decline to reopen). The route the Board chooses, in turn, frames our review: Did the Board "distort[ ] or disregard[ ] important aspects of the applicant's claim"? *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). Did it "make rulings that are based 'on an inaccurate perception of the record'"? *Id.* (quoting *Jian Tao Lin v. Holder*, 611 F.3d 228, 237 (4th Cir. 2010)). Did it act "contrary to the law"? *Id*. All of these are ways to assess whether, overall, the Board abused its discretion. But courts must separate out the subsidiary factual or legal or mixed factual and legal determinations to understand why the Board denied the motion. And they must apply the usual standards to review those subsidiary determinations: de novo for law, *Guerrero-Lasprilla*, 140 S. Ct. at 1069, substantial evidence for fact, *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019), and, as the Court has recently clarified, either de novo or substantial evidence for mixed questions, depending on "whether answering [them] entails primarily legal or factual work," *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018) (explaining that "[m]ixed

questions are not all alike," some turn on "developing auxiliary legal principles of use in other cases," while others "immerse courts in case-specific factual issues").

The government asks us to short-circuit this common-sense approach and consider only whether the Board abused its discretion overall. That may be appropriate where the Board "leap[s] over" substantive and procedural questions "and simply determine[s]" it will deny relief as a matter of "discretion" even if a noncitizen proves his legal claim. *Abudu*, 485 U.S. at 105 (allowing the agency to do so where "the ultimate grant of relief is discretionary"). But that is not what the Board did here. And we "may uphold agency action only on the grounds the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

Undaunted, the government holds out *Jean*, 435 F.3d at 482–83, *Lawrence*, 826 F.3d at 203, and an older Supreme Court case, *INS v. Doherty*, 502 U.S. 314, 323 (1992), as mandating abuse-of-discretion review for all reconsideration decisions. But none of these cases supports the government's position in the way it claims. In *Jean*, the Board denied a noncitizen's request to reconsider its previous refusal to cancel removal because it could "find no new legal argument" in Jean's motion. 435 F.3d at 483 (citation omitted). We affirmed under abuse of discretion, and rightly so. There was nothing legal or factual about the Board's conclusion; we needed to ascertain only that "the BIA supplied a rational explanation" for its denial. *Id*. But we clarified that "our review [was] limited to the motion to reconsider" as Jean never petitioned for review of the Board's original ruling that she was not entitled to cancellation of removal. *Id.* at 482. Had Jean done so, we would have focused on the specific reason the BIA gave for its decision—"that Jean was

statutorily precluded from demonstrating good moral character"—and we would have reviewed it de novo. *Id.* Even though "cancellation of removal" ultimately calls for "a discretionary form of relief," we explained, whether Jean was statutorily precluded from that relief was a "legal," "not a discretionary decision.". *Id.*

The same goes for *Lawrence*. Although we noted that we review the ultimate denial to reopen "for abuse of discretion," Lawrence's specific challenge was narrower: He maintained "the Board applied a heightened diligence standard that required absolute diligence rather than reasonable diligence and therefore committed an error of law." 826 F.3d at 203–04. Correspondingly, we analyzed whether the Board "set forth the correct standard." *Id.* at 204. We held that it did, because the Board understood "due diligence" as "*we define*" that term—not because *the Board* gave its own legal interpretation of the term to which we deferred. *Id.* (emphasis added) (citation omitted). Our review of the narrow legal question was thus de novo—in deed, if not by express terms.

Finally, the government ignores the critical context behind *Doherty*'s pronouncement that "the abuse-of-discretion standard applies to motions to reopen regardless of the underlying basis of the alien's request for relief." 502 U.S. at 323 (cleaned up) (citation omitted). It reads "regardless of the underlying basis" as setting the abuse-of-discretion standard for all motions to reopen no matter why the BIA denied them. But *Doherty* (and *Abudu*, where the phrase originated) held only that the same standard applies "regardless" of whether a noncitizen asks to reopen to consider his "claims for asylum [or his] claims for withholding of deportation," because the two involve substantially the same inquiries. *See id.* at 324; *Abudu*, 485 U.S. at 99 n.3. Neither case said anything about

applying the same standard "regardless" of whether the BIA issued a decision rooted in fact, discretion, or law. Quite the opposite, the Court declined to espouse a standard for reviewing a denial to reopen on grounds that "the movant has not established a prima facie case for the underlying substantive relief sought." 485 U.S. at 104; *see also* 502 U.S. at 323. If anything, those cases reinforce our conclusion that the proper standard depends on the discrete question we must review, not some broader conclusions the BIA could have but did not, in fact, draw.

None of this is novel or controversial. We have repeatedly held across immigration decisions—yes, even where the BIA had discretion to ultimately withhold relief—that "we review legal questions de novo" and factual decisions for "substantial evidence." *Diaz de Gomez v. Wilkinson*, 987 F.3d 359, 363 (4th Cir. 2021) (asylum); *see also, e.g.*, *Gonzalez Galvan v. Garland*, 6 F.4th 552, 561 (4th Cir. 2021) (cancellation of removal); *Gonzalez v. Garland*, 16 F.4th 131, 145 (4th Cir. 2021) (motions to remand). That makes good sense: A self-contained factual finding is either supported by the record or not; a legal conclusion is either right or wrong. And that is why the abuse-of-discretion standard itself directs courts to reverse where an agency "distorts" the record or acts "contrary to law." *Lawrence*, 826 F.3d at 203 (cleaned up) (citations omitted).

Unsurprisingly, our sister circuits likewise parse out the predicate questions that form the building blocks for BIA decisions. The Third and the Fifth Circuits have both recently confirmed that although they "appl[y] a highly deferential abuse-of-discretion standard" to the BIA's day-end "denial of a motion to reopen," as part of that analysis, they "review[ ] legal conclusions de novo and factual findings for substantial evidence."

*Guerrero-Lasprilla v. Barr*, 822 F. App'x 254, 257 (5th Cir. 2020) (asking whether the BIA "err[ed]" in holding the noncitizen could have filed earlier); *see Darby v. U.S. Att'y Gen.*, 1 F.4th 151, 159 (3d Cir. 2021) (setting forth the same standard); *Liang v. U.S. Att'y Gen.*, 15 F.4th 623, 626–30 (3d Cir. 2021) (Jordan and Ambro, JJ., concurring) (clarifying that the court applied de novo review to the specific question that needed resolving—whether the maltreatment a noncitizen alleged amounted to past persecution—even where the BIA's denial of asylum was discretionary overall). The Sixth Circuit offers more of the same. In *Singh v. Rosen*, for example, the court acknowledged Congress left cancellation of removal to agency discretion but reasoned that the underlying question of whether removal would pose "exceptional and extremely unusual hardship" to a noncitizen's family involves "applying the law to a set of facts" and so requires de novo review when the court "expound[s] on the law." 984 F.3d 1142, 1152–54 (6th Cir. 2021) (quoting *U.S. Bank*, 138 S. Ct. at 967), *reh'g denied* (Feb. 11, 2021).

We see no reasoned principle by which to single out BIA denials to reopen or reconsider from scores of other discretionary agency decisions. *See Abudu*, 485 U.S. at 105 (observing that the BIA has discretion to deny relief in swaths of cases, including "asylum, suspension of deportation, and adjustment of status"). Consequently, we worry that applying abuse of discretion indiscriminately to all subsidiary questions here would reverberate across and likely jeopardize decades of that settled jurisprudence. We decline to do so and instead confirm the staple principle that appellate courts must match the standard of review to the specific rationale the BIA gave for its decision.

B.

That part was straightforward. The harder question is how exactly to characterize BIA tolling determinations. In the past, we have given conflicting answers to this question. In some cases, "where the relevant facts [were] undisputed and the district court denied equitable tolling as a matter of law, we review[ed] the district court's decision de novo." *Rouse v. Lee*, 339 F.3d 238, 248 (4th Cir. 2003) (en banc). But in "other circumstances," we suggested "abuse of discretion" may be more appropriate. *Id*. *Rouse* itself applied abuse of discretion to the district court's determination that, "accepting all of the facts Rouse pled about his health to be true, his medical condition did not amount to an extraordinary circumstance beyond his control that prevented him from filing." *Id.* at 248 & n.10. But if *Rouse* was meant to signal some broader shift to a more deferential standard, our follow-on cases have not embraced it. While they continue to dutifully recite *Rouse*'s mantra that our Court "typically" reviews "equitable tolling arguments only for abuse of discretion," they go on to consider anew whether the "facts demonstrate a failure to bring a timely claim." *Cruz v. Maypa*, 773 F.3d 138, 143 (4th Cir. 2014) (cleaned up) (citing *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003)); *accord Ott v. Md. Dep't of Pub. Safety & Corr. Servs.*, 909 F.3d 655, 658 (4th Cir. 2018); *Warfaa v. Ali*, 1 F.4th 289, 293 (4th Cir. 2021). That later approach seems right to us.

Consider first *Guerrero-Lasprilla*. The Court, as noted above, expressly reserved the question of the "proper standard" of review. 140 S. Ct. at 1069. But it prescribed that the answer must "turn on practical considerations, such as whether the question primarily requires courts to expound on the law . . . or rather immerses courts in case-specific factual

issues," because diligence for equitable-tolling purposes presents a "mixed question of law and fact." *Id.* (cleaned up) (quoting *U.S. Bank*, 138 S. Ct. at 966–67). What the Court squarely did *not* contemplate was putting equitable tolling to agency *discretion*. *See Singh*, 984 F.3d at 1150, 1154 (reading *Guerrero-Lasprilla* as setting to one side "mixed question[s] about whether the facts found by the immigration judge [satisfy] the legal test," where courts must choose between de novo and some version of substantial-evidence review, and to the other side "discretionary question[s]," which call for the abuse-of-discretion standard); *Mejia-Espinoza v. U.S. Att'y Gen.*, 846 F. App'x 140, 143 n.5 (3d Cir. 2021) (distinguishing "a mixed question of law and fact" considered in *Guerrero-Lasprilla* from a "discretionary determination" (citation omitted)); *cf. In re EuroGas, Inc.*, 755 F. App'x 825, 831 (10th Cir. 2019) (legal, factual, mixed, and discretionary decisions pose "distinct" questions and require courts to "apply[ ] the appropriate standard of review to each").

Consider also what courts (and agencies) mean when they speak of diligence for equitable-tolling purposes. They do not contemplate diligence in "general[ ]," quotidian terms but prescribe a "precise and elevated standard" an applicant must satisfy. *Gonzalez Galvan*, 6 F.4th at 560. The applicant must demonstrate, based on the totality of the circumstances, that he made a "reasonable" effort to pursue his claims in the face of extraordinary obstacles standing in his way. *Holland v. Florida*, 560 U.S. 631, 653 (2010). And if the applicant meets that standard, we are told he is "*entitled* to equitable tolling." *Id.* at 649 (emphasis added) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also, e.g.*, *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016).

That simply does not look like a determination left to agency discretion. *See* 8 U.S.C. § 1231(b)(2)(C) (the agency "may disregard" a noncitizen's country of choice if "the Attorney General decides that removing the alien to the country is prejudicial to the United States"); *id.* § 1158(a)(1) (any noncitizen present in the United States "may apply for asylum"); *id.* § 1255 ("the Attorney General may adjust the status of the alien" under certain conditions); *cf.* 17 U.S.C. § 505 ("the court in its discretion may allow the recovery of full costs"); *Gall v. United States*, 552 U.S. 38, 46 (2007) (because Sentencing Guidelines are no longer mandatory, the district court has discretion in how to apply them). A noncitizen's entitlement to equitable tolling, in short, implicates a "matter of right," not "grace." *St. Cyr*, 533 U.S. at 308.

When it comes to reviewing the BIA's equitable-tolling rulings, then, our only choice should be between de novo and substantial evidence, depending on whether we think our review "entails primarily legal or factual work." *U.S. Bank*, 138 S. Ct. at 967.[7] Those inquiries are not always "easy to separate," *Wainwright v. Witt*, 469 U.S. 412, 429 (1985), but, on balance, we think de novo is a better fit. We begin with how *U.S. Bank* itself characterizes legal decisionmaking: as "elaborating on a broad legal standard" and

[7] Although *Pennington*, *Maypa*, *Ott*, and *Warfaa* all declared this Court should analyze equitable tolling de novo because the question requires us to map facts onto a legal standard, such general pronouncements appear wanting after *U.S. Bank*—all mixed questions involve applying "a legal test" to "the historical facts." *U.S. Bank*, 138 S. Ct. at 966. We must instead decide whether equitable tolling (and diligence in particular) calls for primarily legal or factual determinations. *Id.* at 967. Because we have "never squarely addressed th[at] issue"—not even in *Ott* or *Warfaa*, decided post-*U.S. Bank*—we do so here. *Brecht v. Abrahamson*, 507 U.S. 619, 630–31 (1993); *see also Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007).

"developing auxiliary legal principles of use in other cases." 138 S. Ct. at 967. Because equitable tolling was originally a concept fashioned by judges, *see, e.g.*, *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 558 (1974), our cases continue to "provide legal interpretations" of the doctrine. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1200 (2021) (concluding that copyright's fair-use questions should be reviewed de novo after *U.S. Bank* because the Court's interpretations of that judge-made doctrine "still provide . . . general guidance for future cases"). In this very case, the parties quarrel over when we should start the diligence clock; they question the scope of the obligation a noncitizen's family has to research the law or hire a lawyer on the noncitizen's behalf; they argue over what level of vigilance we can fairly expect from a noncitizen who has lived in another country for over a decade before the United States finally changed the law. "This type of work is legal work." *Id.* ("developing auxiliary legal principles" includes deciding that "the scope of fair use is narrower with respect to unpublished works" and that "wholesale copying aimed at creating a market substitute is presumptively unfair" (citations omitted)).

And to the extent our work involves incidental factual determinations, we are asked to do no more here than in any other case that tasks courts with determining whether a person acted reasonably in view of the totality of the circumstances—decisions courts have historically made de novo. *E.g.*, *United States v. Arvizu*, 534 U.S. 266, 275 (2002) (whether police had "reasonable suspicion" to effectuate a stop); *Elder v. Holloway*, 510 U.S. 510, 513, 516 (1994) (whether an officer's conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known" (citation omitted)); *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 823 (4th Cir. 2013) ("whether a

reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct" (citation omitted)); *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 411 (4th Cir. 2013) (whether "a reasonable person" would find supervisor behavior "objectively offensive" so as to amount to battery); *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (whether "all the circumstances surrounding [a police] encounter" "would have communicated to a reasonable person that the person was not free" to leave (citation omitted)); *Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1551 (4th Cir. 1994) ("whether a defamation plaintiff is a limited-purpose public figure" (citations omitted)).

Also relevant is that the decision to deny equitable tolling was made by the BIA, not the IJ. *U.S. Bank* explained that the appropriate standard of review "reflects which 'judicial actor is better positioned' to make the decision." 138 S. Ct. at 967 (quoting *Miller v. Fenton*, 474 U.S. 104, 114 (1985)); *see also, e.g.*, *Buford v. United States*, 532 U.S. 59, 64 (2001) (rejecting de novo review where "the district court is in a better position than the appellate court to decide whether a particular set of individual circumstances" meets the legal test); *Wainwright*, 469 U.S. at 429 (juror bias presents a factual issue because the court's "predominant function in" resolving it "involves credibility findings whose basis cannot be easily discerned from an appellate record"). The BIA held no hearing, took no evidence, made no credibility determinations below. It merely read Williams's motion and the written declarations attached. We can conduct this analysis just as well.

Indeed, even where the BIA reviews an IJ's equitable-tolling determination, it does so "de novo," *In re Lugo-Resendez*, 2017 WL 8787197, at *3 (BIA 2017), in keeping with

the agency's "analytical approach to deciding cases," which "focuses on the qualities of adjudication that best suit the different decisionmakers," Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878, 54,890 (Aug. 26, 2002).[8] We see no reason to abandon that approach at the courts of appeals, to conceptualize as factual the same question the BIA deemed legal below.

We are finally comforted by the fact that the Supreme Court and other circuits appear to approach equitable tolling as a matter of law. In *Holland*, the Court held the district court's "conclusion was incorrect" because the facts before it readily established reasonable diligence. 560 U.S. at 653. Nowhere did the Court refer—much less *de*fer—to the lower courts' rationales. *See id.* The Court simply determined for itself that Holland acted with diligence. *See id.* at 671 (Scalia, J., dissenting) (lamenting the Court's reach because the court of appeals had no opportunity to pass on the question). More recently, *Menominee Indian Tribe* denied equitable tolling because the "Tribe offere[d] no circumstances" that were "both extraordinary and beyond its control." 577 U.S. at 257

[8] Following *Lugo-Resendez*, we would likely reverse the BIA even under the abuse-of-discretion standard. There, the BIA held "equitable tolling of the reopening deadline [was] appropriate" even though a noncitizen did not discover a change in the law until two years after the Supreme Court promulgated its decision (as compared to Williams's one) and then waited an additional two months to ask to reopen after his discovery (again, as compared to Williams's one). 2017 WL 8787197, at *3. And still the BIA excused the delay—thirteen years overall—because the noncitizen "was unaware that the law affecting his removability could change," "no one in his family has attended law school or become an attorney, he was unable to follow legal developments in the United States" after he was removed to Mexico, and he could not "afford to regularly consult with an attorney." *Id.* Without explanation, the BIA reached the opposite result here. That falls far short of the kind of "reasoned decisionmaking" an agency must engage in. *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

(emphasis omitted). Once again, the Court said nothing about deferring to a lower court's determination on this question. *See id.* Several circuit courts have followed that same path. *See Zhao v. INS*, 452 F.3d 154, 159 (2d Cir. 2006) (holding "the BIA erred" in determining the motion to reopen time-barred); *Fernandez Taveras v. U.S. Att'y Gen.*, 842 F. App'x 762, 763 n.1 (3d Cir. 2021) (applying "the equitable tolling standard 'to undisputed or established facts'" "de novo" (quoting *Nkomo v. U.S. Att'y Gen.*, 986 F.3d 268, 272 (3d Cir. 2021))), *cert. denied sub nom. Taveras v. Garland*, 142 S. Ct. 771 (2022); *Zaldivar Anzardo v. U.S. Att'y Gen.*, 835 F. App'x 422, 426 (11th Cir. 2020) (characterizing "equitable tolling" as a "question[ ] of law"); *Guerrero-Lasprilla*, 822 F. App'x at 256 (concluding the "BIA did not err" in denying equitable tolling because "an uncertain legal landscape" did not constitute "an extraordinary circumstance" (quoting *Menominee Indian Tribe*, 557 U.S. at 258)). And we ourselves have required de novo review for analogous questions, including whether maltreatment an immigrant suffers amounts to torture, whether a government's response to that torture constitutes acquiescence, whether an immigrant will experience extreme hardship upon being deported, and whether an immigrant entered into a marriage in good faith. *See Cruz-Quintanilla*, 914 F.3d at 890; *Upatcha v. Sessions*, 849 F.3d 181, 186 (4th Cir. 2017); *Gonzales Galvan*, 6 F.4th at 561. Those questions appear to us indistinguishable in any material respect from the BIA's equitable-tolling determination below.[9]

[9] The government protests *Upatcha* and *Cruz-Quintanilla* concerned the standard of review the BIA applies to the IJ's decisions, not the standard by which appellate courts review the BIA. But as we already explained, we find it difficult to understand why the same question would be legal before the BIA but factual or discretionary before the courts of appeals.

We thus hold that the BIA's decision to deny equitable tolling presents a mixed question we must review de novo. And as always, we review the lone subsidiary, factual issue—whether Williams's attorney represented him pro bono—for substantial evidence.

IV.

The last preliminary question we must decide is whether the statutory time and number limitations on motions for reconsideration can be tolled at all. In *Holland*, the Court held that "AEDPA's statutory limitations period can be tolled for equitable reasons." 560 U.S. at 645. Without setting forth any rigid factors, the Court observed that the provision "is not jurisdictional," it "does not contain language that is 'unusually emphatic,'" does not provide a "particularly long" limitations period, and that equitable tolling would not "undermine[ ] AEDPA's basic purposes." *Id.* at 645, 647–48 (citations omitted). Those are equally true of § 1229a(c)(6). Nothing in the INA "set[s] forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'" *Id.* at 645 (citation omitted). The language is not emphatic—§ 1229a(c)(6) states just once that noncitizens must file within thirty days of the final removal order. The time to file is much shorter than AEDPA's one-year period. And, as this very case illustrates, there are good reasons to equitably toll both the time and number limitations to accommodate changes in the U.S. immigration law that would allow noncitizens to reunite with their families.

Even more to the point, this Court has already permitted the BIA to equitably toll the ninety-day deadline to file a motion to reopen. *See Kuusk v. Holder*, 732 F.3d 302, 305 (4th Cir. 2013). The statutory text addressing motions to reopen and reconsider is

functionally identical. *Compare* 8 U.S.C. § 1229a(c)(6)(B) (the motion to reconsider "must be filed within 30 days of the date of entry of a final administrative order of removal"), *with id.* § 1229a(c)(7)(C)(i) ("the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal"). And the government agrees we should treat them the same. *See* Resp. Br. 17 n.2. So do other circuits. *See Lona v. Barr*, 958 F.3d 1225, 1230 (9th Cir. 2020); *Gonzales-Alarcon v. Macias*, 884 F.3d 1266, 1270 (10th Cir. 2018); *see also Lugo-Resendez v. Lynch*, 831 F.3d 337, 343 (5th Cir. 2016) (tolling numeric limitations); *Singh v. Holder*, 658 F.3d 879, 884 (9th Cir. 2011) (same); *Zhao*, 452 F.3d at 159–60 (same). We join in this understanding and hold the statutory time and number limitations for motions to reconsider subject to equitable tolling.

## V.

With those background principles in mind, we turn, finally, to the merits of Williams's claim. Noncitizens seeking equitable tolling must demonstrate they "ha[ve] been pursuing [their] rights diligently" but "extraordinary circumstances beyond [their] control made it impossible to file within the statutory deadline." *Lawrence*, 826 F.3d at 204 (citations omitted). That is a high bar, to be sure, making tolling available "'only sparingly,' not in 'a garden variety claim of excusable neglect.'" *Kuusk*, 732 F.3d at 306 (quoting *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990)). But it is not "insurmountable." *Warfaa*, 1 F.4th at 294. A noncitizen needs to act only with "reasonable," "not maximum feasible diligence." *Holland*, 560 U.S. at 653 (citations omitted). We readily conclude that Williams has done just that.

As our starting point, we consider the proper point in time from which to measure Williams's diligence. In 2010, the Supreme Court held that "violent force" means "force capable of causing physical pain or injury." *Johnson*, 559 U.S. at 139–40. Applying *Johnson* that same year, the BIA ruled that a Va. Code Ann. § 18.2-57 conviction no longer qualified as an aggravated felony under § 16(a) because it comprised the "slightest touching of another." *Velasquez*, 25 I. & N. Dec. at 281 (citation omitted). But the agency had found Williams committed an aggravated felony under both §§ 16(a) and (b). So it was not until 2018, when the Court struck § 16(b) as unconstitutionally vague, that Williams became entitled to relief. *See Dimaya*, 138 S. Ct. at 1223. In denying equitable tolling below, however, the BIA alluded multiple times to Williams's obligation to "regularly [seek] out pro bono counsel." A.R. 5; *see also id.* (faulting Williams for failing to seek "assistance from pro bono counsel *prior to, or* soon after" *Dimaya* (emphasis added)). The BIA thus appeared to base its diligence ruling at least in part on Williams's conduct before 2018. With that we cannot agree—before 2018, Williams had no "rights" to pursue. *See Holland*, 560 U.S. at 649 (clarifying that equitable tolling asks whether a petitioner "has been pursuing his *rights* diligently" (emphasis added) (citation omitted)).

The government protests we cannot avoid *Lawrence*, which observed that a noncitizen must "demonstrate that he acted with due diligence during the entire period he [seeks] to toll." 826 F.3d at 205 (cleaned up) (discussing *Rashid v. Mukasey*, 533 F.3d 127 (2d Cir. 2008)). But the government places more weight on that quotation than it can bear: The same paragraph that cited *Rashid* considered only whether Lawrence showed diligence "during the two years after" the Supreme Court changed immigration law and "the year-

and-a-half after he contacted" the lawyer about that legal change. *Id.* at 204–05. Nowhere did we discuss Lawrence's conduct before the Supreme Court's ruling—that is, before Lawrence became entitled to cancellation of removal—or intimate we would do so in future cases.

Unscrupulous reliance on *Rashid* is all the more unconvincing because *Rashid* did not deal with a change in the law but with ineffective assistance of counsel. That type of claim lends itself to a different analysis: Although in some cases, it will be truly beyond a noncitizen's ken to understand counsel's inadequacy, in most circumstances, courts are right to ask whether a noncitizen at least "follow[ed] up with his attorney after the DHS decision" or tried to "obtain new counsel" because doing so might have helped uncover the inadequacy early on. *Rashid*, 533 F.3d at 133. Yet visiting additional attorneys before 2018 would not have helped Williams. In 2006, he argued *three times* to the IJ and the BIA that his conviction should not be classified as an aggravated felony because "use of force is not an element" of Va. Code Ann. § 18.2-57. A.R. 320 (original proceedings before the IJ); *see also id.* at 97 (defending the IJ's ruling that the Virginia statute "did not comport with the requirements under federal law defining a crime of violence" on government's appeal to the BIA); *id.* at 80 (reasoning that "use of force must be an element of the crime and the Virginia Statute text is unambiguous that force is not listed as an element" on first motion for reconsideration to the BIA). That is the exact argument the Supreme Court would finally accept in 2010. But in 2006, the BIA turned Williams down twice. As did this Court. *See Williams*, 234 F. App'x at 114 (denying his petition).

In the end, even *Rashid* acknowledged the diligence inquiry centers on when a noncitizen "knew or should have known" of his rights. 533 F.3d at 132. That is a functional test. We do not ask, in a vacuum, whether Williams should have contacted X number of attorneys over the twelve years he spent in Jamaica, but whether he "reasonably should have" discovered *Dimaya* before 2019. *Zhao*, 452 F.3d at 158, 159; *accord Holland*, 560 U.S. at 649. Taking stock of the totality of the circumstances Williams presented, the answer to *that* question is no.

The Board opined Williams could have discovered his eligibility sooner had he "regularly" sought the advice of a pro bono attorney. A.R. 5. Because Williams learned of *Dimaya* only a year after the Court issued the decision, the Board must have required Williams to consult with an attorney more "regularly" than that. But recall that, even when Williams lived in the United States, he had trouble securing a pro bono attorney—and the IJ recognized as much, granting him four requests for continuance. And Person ultimately felt compelled to spend the little money she had to pay an attorney—we agree here with Williams that substantial evidence does not support the BIA's conclusion that the attorney acted pro bono, *see id.* at 9 (showing she checked "no" next to acting "pro bono" when entering her appearance). Expecting Williams to have secured a pro bono attorney so often as to discover *Dimaya* before 2019 is not reasonable. Nor is expecting him to "maintain[ ] contact with" the attorney who represented him in 2006—an alternative the BIA advised. *Id.* at 5. That attorney ended his representation in 2007, before Williams could even petition this Court to review the BIA's original removal decision. Williams had no reason to think he would renew his representation *after* Williams was deported.

Accepting the difficulties of finding pro bono representation, the government suggests Williams could have hired an attorney. But again, by the time *Dimaya* came out in 2018, Williams had been in Jamaica for eleven years. So, to successfully discover *Dimaya* sooner than 2019, Williams would had to have hired an attorney more than once per year throughout those years. Yet Williams makes only a few dollars a week after room and board. He has no access to the Internet. The government's suggestion simply cannot be squared with the realities of Williams's life. And not even the BIA demanded that.

The BIA did, however, fault Williams's wife for failing to "stay informed on the status of the law," "even considering [the] family's low income." *Id*. For one, the BIA cited no law (and we find none) that would allow us to impute her conduct to Williams. For another, the BIA misunderstood the nature of the relationship between them. The pair has two children together, ages twenty and seventeen, but Person has two other children, ages sixteen and fourteen, who are "stepchildren" to Williams. *Id.* at 24, 27. The couple thus did not have the continuous relationship the BIA presumed. And in any event, Person is not an attorney. She does not know how to conduct legal research. And she makes only $20,000 per year, which goes to support her four children, to manage her lung disease, and to make occasional trips to Jamaica so that Williams's children can see their father. We cannot agree it was reasonable for Person to stay abreast of immigration law for eleven years—and do so with such frequency that she would have discovered *Dimaya* before 2019.

The government finally asks us not to consider the meeting with the attorney in 2019 at all, calling it a fortuitous happenstance. Person, the government suggests, retained the

attorney because she thought Williams might be able to return to the United States now that they were married rather than as part of some periodic check on the status of immigration law. But a noncitizen can certainly hire an attorney to both check on how his legal status has changed following a marriage and how the legal landscape itself has changed. We decline to trample on attorney-client privilege by scrutinizing what was said in the meeting and what possible grounds for cancellation of removal Person advanced. Nor do we find anything nefarious in that Person sought out counsel after her lungs deteriorated. Finally obtaining "good legal advice" upon a change in personal circumstances "does not mean [Williams] was dilatory for failing to obtain such advice sooner"; "there is a difference between diligence and desperation." *Gordillo v. Holder*, 640 F.3d 700, 706 (6th Cir. 2011).

On top of that, Williams has been exceedingly diligent after he learned of *Dimaya*. His attorney filed for reconsideration just one month after receiving Williams's records from the DHS under the Freedom of Information Act. Even though diligence after discovery is not determinative, as Williams would have us hold, it still demonstrates Williams did not sleep on his rights. *Compare Sun v. Mukasey*, 555 F.3d 802, 806 (9th Cir. 2009) (granting petition largely because the applicant "acted with admirable diligence after retaining new counsel," even where years went by after initial ineffective assistance of counsel), *with Wang v. Bd. of Immigr. Appeals*, 508 F.3d 710, 715 (2d Cir. 2007) (faulting an immigrant for waiting several months to file a motion to reconsider after he found out about a change in the law). At bottom, Williams's rights hinged on complicated, multistep decisions handed down by the Supreme Court, not "garden variety" attorney

negligence Williams could have easily discovered on his own. *See Holland*, 560 U.S. at 652 (citation omitted). Still, he discovered his rights just one year after the Court enunciated them. Giving "due consideration to the reality that many departed aliens are poor, uneducated, unskilled in the English language, and effectively unable to follow developments in the American legal system," *Lugo-Resendez*, 831 F.3d at 345, we hold Williams could not "reasonably have been expected to have filed earlier." *Pervaiz v. Gonzales*, 405 F.3d 488, 490 (7th Cir. 2005) (Posner, J.); *accord Sun*, 555 F.3d at 806 (two-year delay did not evidence "lack of due diligence" under the circumstances). We accordingly vacate the BIA's diligence ruling.

* * *

Because the BIA determined Williams not diligent, it did not consider whether *Johnson* and *Dimaya* presented an extraordinary circumstance that would warrant equitable tolling. In previous cases, the BIA has held that Supreme Court decisions that significantly change the legal landscape meet this bar. *See Lugo-Resendez*, 2017 WL 8787197, at *1, *3 (discussing *Lopez v. Gonzalez*, 549 U.S. 47 (2006), which held that the noncitizen's drug offense no longer qualified as an aggravated felony); *In re G-D-*, 22 I. & N. Dec. 1132, 1135 (BIA 1999) (characterizing "a fundamental change in the principles of the law" as an "exceptional" circumstance warranting sua sponte reopening); *see also Lona*, 958 F.3d at 1230 ("The BIA may equitably toll this statutory filing deadline, including in cases where the petitioner seeks excusal from untimeliness based on a change in the law that invalidates the original basis for removal."). Still, the "ordinary" rule demands we remand to the BIA to decide this issue in the first instance, *INS v. Orlando Ventura*, 537 U.S. 12,

18 (2002), and the parties do not oppose that course. We thus remand to the BIA to decide whether the legal changes in *Johnson* and *Dimaya* constitute extraordinary circumstances and whether, on the whole, Williams's request to reconsider merits a favorable exercise of discretion. But we caution, as other courts have done before us, that denial of equitable tolling here would create a "particularly serious" concern, as it would preclude Williams from seeking cancellation of removal "when it is evident that the basis for his removal is now invalid." *Lugo-Resendez*, 831 F.3d at 345.[10]

VI.

For the foregoing reasons, we GRANT the petition, VACATE the judgment of the BIA, and REMAND the case for further proceedings consistent with this opinion.

---

[10] In alternative, Williams asks that we hold the BIA legally erred in declining to reconsider sua sponte under 8 C.F.R. § 1003.2(a). The government objects we have no jurisdiction to review committed to agency discretion by law because "there are no meaningful standards for courts to apply in review." *Mosere v. Mukasey*, 552 F.3d 397, 401 (4th Cir. 2009). But whether *Mosere* applies to legal errors "underlying" the BIA's exercise of "its sua sponte power" is a question we expressly left open in *Lawrence*, 826 F.3d at 207 n.5, in 2016. Because we agree with Williams on equitable tolling, we do not decide this question. We note, however, that at least seven of our sister circuits recognize jurisdiction to review such legal errors. *See Thompson v. Barr*, 959 F.3d 476, 483 (1st Cir. 2020); *Mahmood v. Holder*, 570 F.3d 466, 469 (2d Cir. 2009); *Pllumi v. U.S. Att'y Gen.*, 642 F.3d 155, 160 (3d Cir. 2011); *Rodriguez-Saragosa v. Sessions*, 904 F.3d 349, 355 (5th Cir. 2018); *Fuller v. Whitaker*, 914 F.3d 514, 519 (7th Cir. 2019); *Bonilla v. Lynch*, 840 F.3d 575, 586–88 (9th Cir. 2016); *Reyes-Vargas v. Barr*, 958 F.3d 1295, 1300 (10th Cir. 2020).

RUSHING, Circuit Judge, dissenting:

The majority tasks itself with deciding three threshold questions of law in this case: (1) whether the jurisdictional bar in 8 U.S.C. § 1252(a)(2)(C) applies to a petition seeking review of a Board of Immigration Appeals decision denying reconsideration of a prior removal order; (2) under what standard we review a Board decision denying equitable tolling of the limits on motions to reconsider for lack of diligence; and (3) "whether the statutory deadline for a motion to reconsider can be equitably tolled at all." *Supra*, at 8. Only the last question is actually open in our Circuit. Prior decisions have conclusively answered the jurisdictional question and set the standard of review. Yet the majority purports to resolve these questions anew in contradiction of our precedent as well as that of the Supreme Court and our sister courts of appeals. I respectfully dissent.

By way of background, federal law allows a noncitizen to file one motion to reconsider within 30 days of a final order of removal. 8 U.S.C. § 1229a(c)(6). Petitioner filed his second motion to reconsider 12 years and 10 months after the Board issued his final order of removal. He asked the Board to equitably toll the time and number limitations, which required him to show that he had been diligently pursuing his rights. Petitioner admitted that he did "not do anything for the previous twelve years or so" since he was removed. A.R. 25. But he stated that his wife contacted an attorney once, in April 2019. As a result, Petitioner learned that his assault conviction no longer qualified as an aggravated felony due to intervening Board and judicial decisions and that he might be eligible to apply for cancellation of removal. After this discovery, Petitioner claimed, he diligently sought relief. The Board denied Petitioner's request for equitable tolling and so

necessarily denied his motion to reconsider as time- and number-barred. It also denied *sua sponte* reopening. *See* 8 C.F.R. § 1003.2(a) (2020).

Petitioner asks us to vacate the Board's decisions based on our own reassessment of his diligence, including what he claims is a factual misstatement by the Board. But Petitioner recognizes that 8 U.S.C. § 1252(a)(2)(C) strips us of jurisdiction to review questions of fact because, in addition to his assault conviction, he was also removable for having committed multiple "crimes involving moral turpitude," 8 U.S.C. § 1227(a)(2)(A)(ii). To avoid this jurisdictional limitation, Petitioner urges us to reverse the 2006 moral turpitude ruling against him, despite his failure to exhaust his challenge to that ruling before the Board. Acknowledging the "perhaps insurmountable hurdle" erected by Petitioner's failure to exhaust, the majority declines to resolve his argument. *Supra*, at 17 n.6.

Instead, the majority issues a sweeping ruling neither advanced nor briefed by either party: It holds that Section 1252(a)(2)(C)'s jurisdictional bar does not apply to petitions for review of the Board's denial of reconsideration or reopening because those decisions are not "final order[s] of removal." Undoubtedly, no party made this argument because our Court has already held the opposite, as have all the other courts of appeals to consider the question. By changing course, the majority today creates a lopsided 1-to-10 circuit split.

The majority then reviews the Board's equitable tolling determination de novo. But our cases have consistently reviewed the Board's equitable tolling decisions—including its due diligence assessments—under a more deferential abuse-of-discretion standard.

Applying the correct standard here, the Board did not abuse its discretion in denying reconsideration based on the arguments and evidence Petitioner presented to the Board. And, as we have also held in previous decisions, we lack jurisdiction to review the Board's denial of *sua sponte* reopening. Accordingly, I would deny the petition for review in part and dismiss in part.

I.

The Immigration and Nationality Act (INA) provides for judicial review of "a final order of removal" against a noncitizen. 8 U.S.C. § 1252(a). Section 1252(a)(2)(C), however, forbids any court from reviewing "any final order of removal against an alien who is removable by reason of having committed" certain crimes, including aggravated felonies and crimes involving moral turpitude. Subparagraph (D) explains that courts nevertheless retain jurisdiction to consider "constitutional claims or questions of law" in such instances. *Id.* at § 1252(a)(2)(D). Practically speaking, then, subparagraph (C) forbids "appeals of factual determinations." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1073 (2020).

We have jurisdiction to review so-called "mixed questions" of law and fact. *Id.* at 1069. Everyone agrees that applying the legal standard for equitable tolling to undisputed or established facts is a such a question. And everyone agrees that subparagraph (C) denies us jurisdiction to review questions of fact in a petition from the Board's final order of removal against a criminal noncitizen. But the majority contends that subparagraph (C) does not apply to petitions from the Board's decision declining to *reconsider* its removal order against the same criminal noncitizen because the decision denying reconsideration is

not itself a "final order of removal" within the meaning of the INA. Precedent from all corners refutes that conclusion. And even if it were an open question, the majority's analysis is incorrect.

A.

It is well settled that Board decisions denying reopening or reconsideration are treated as final orders of removal in Section 1252(a), including for purposes of subparagraph (C)'s jurisdictional bar. The Supreme Court's decisions compel this conclusion. Our Court has so held. And our sister circuits have "uniformly" agreed. *Musangu v. Holder*, 517 Fed. App. 166, 168 (4th Cir. 2013).

The Supreme Court has long held that "jurisdiction to review 'final order[s] of removal'" in Section 1252(a)(1) "encompasses review of decisions refusing to reopen or reconsider such orders." *Reyes Mata v. Lynch*, 576 U.S. 143, 147 (2015). When the Board issues a deportation order and then later denies a motion to reconsider that order, "two separate final orders" exist that a court of appeals has jurisdiction to review. *Stone v. INS*, 514 U.S. 386, 395 (1995). Accordingly, "this Court and our sister circuits have traditionally interpreted 'final order of deportation' . . . to include a BIA order denying a motion to reopen" or reconsider. *Stewart v. INS*, 181 F.3d 587, 593 (4th Cir. 1999).

This understanding of "final order of removal" in Section 1252(a)'s jurisdictional grant applies equally to the same phrase in subparagraph (C)'s jurisdictional restriction. Indeed, that is the entire premise of the Supreme Court's decision in *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062 (2020). The petitioners in that case were removed from the country after committing drug crimes specified in subparagraph (C). After the time for seeking

reconsideration or reopening had passed, the petitioners asked the Board to reopen their removal proceedings because intervening judicial and Board decisions had rendered them eligible for discretionary relief. The Board denied the petitioners' requests for equitable tolling, concluding that they had failed to demonstrate due diligence. *Id.* at 1067. As the Supreme Court explained, "in this kind of immigration case (involving aliens who are removable for having committed certain crimes), a court of appeals may consider only 'constitutional claims or questions of law.'" *Id.* at 1068 (quoting 8 U.S.C. § 1252(a)(2)(D)). In other words, subparagraph (C) prevented review of factual questions even though the petitioners sought review of the denial of their motions to reopen instead of their original removal orders. As the Court confirmed, in those cases, the statute "still forbid[s] appeals of factual determinations." *Id.* at 1073.

We have reached the same conclusion expressly in a similar case. Much like this case, the petitioner in *Lawrence v. Lynch* moved to reopen his removal proceedings out of time in order to seek cancellation of removal after an intervening judicial decision. 826 F.3d 198, 202 (4th Cir. 2016). The Board denied equitable tolling, concluding that the petitioner failed to show due diligence. *Id.* In assessing our jurisdiction over the petition, we noted that—just as in this case—even if the petitioner's crimes no longer constituted aggravated felonies, he remained removable based on his crimes involving moral turpitude. *Id.* at 203. "The jurisdictional bar of § 1252(a)(2)(C)," we explained, "therefore precludes our exercising jurisdiction over anything but 'constitutional claims or questions of law.'" *Id.* (quoting 8 U.S.C. § 1252(a)(2)(D)). It made no difference that the petition sought review of the Board's denial of reopening based on equitable tolling rather than the Board's

original removal order from years earlier. Subparagraph (C) applied because the petitioner was "removable by reason of having committed" crimes involving moral turpitude. 8 U.S.C. § 1252(a)(2)(C). That decision squarely applies here.

The majority ignores this aspect of *Lawrence* and instead claims support from a decision interpreting a different statutory provision. In *Obioha v. Gonzales*, 431 F.3d 400, 406 (4th Cir. 2005), we interpreted Section 1252(a)(2)(B)(i) "to preclude review only where the basis for the [Board's] discretionary decision addresses the merits of an enumerated provision" in that statute. *But see Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) (explaining this provision encompasses judgments "of whatever kind," "not just discretionary judgments," and any judgment "*relating to* the granting of relief"). The majority extends a version of that reasoning to subparagraph (C), holding that we have jurisdiction to consider "a factual challenge unrelated to the merits of the final removal order." *Supra*, at 17 (internal quotation marks omitted). But this analysis begins from the erroneous premise that "final order[s] of removal" does not encompass decisions denying reconsideration, a matter *Obioha* had "no need to consider." *Rangolan v. Mukasey*, 302 Fed. App. 133, 136, 137 n.2 (4th Cir. 2008) (noting that "our decision in the case at hand"—that subparagraph (C) "necessarily restricts our review of a denial of a criminal alien's motion to reopen removal proceedings to constitutional and legal questions"—"does not in any way conflict with our recent holding in *Obioha*"). As the Supreme Court has explained, "[s]ubparagraph (B) bars review of only one facet of the removal process (consideration of discretionary relief) whereas subparagraph (C) prohibits review of the entire proceeding (removal based on a criminal offense)." *Patel*, 142 S. Ct. at 1625–1626.

The majority's effort to curtail subparagraph (C) to forbid review only of factual challenges related to the merits of the original removal order cannot be reconciled with *Lawrence* or *Guerrero-Lasprilla*. In *Lawrence*, we held that subparagraph (C) precluded our review of "the Board's factual determination[s]" regarding "due diligence" made "in conducting the equitable tolling inquiry." 826 F.3d at 203 (internal quotation marks omitted). We could hardly have been clearer that subparagraph (C) includes all factual challenges, whether related to the original removal order or, as in that case, not related.[1] Likewise in *Guerrero-Lasprilla*. The petitioners there also sought review of the Board's equitable tolling decisions, but the Supreme Court stated that subparagraph (C) prevented review of factual claims without considering it relevant that facts concerning due diligence are unrelated to the merits of the original removal order. *Guerrero-Lasprilla*, 140 S. Ct. at 1067–1068, 1073.

Every other circuit to consider this question has applied subparagraph (C) to petitions for review of Board decisions denying reconsideration or reopening. *See*, *e.g.*, *Boakai v. Gonzales*, 447 F.3d 1, 4 (1st Cir. 2006); *Durant v. INS*, 393 F.3d 113, 115–116 (2d Cir. 2004), *as amended* (Feb. 1, 2005) (Sotomayor, J.); *Cruz v. Att'y Gen.*, 452 F.3d

[1] *Cucalon v. Barr*, 958 F.3d 245 (4th Cir. 2020), on which the majority relies, *see supra*, at 10–11, also does not support their reformulation. That case concerned whether a certain Virginia crime was an aggravated felony—a legal question that we recognized as falling within subparagraph (D)'s jurisdictional grant. *See Cucalon*, 958 F.3d at 249. In his motion to reconsider, the petitioner raised additional legal arguments in support of his claim. We agreed with the Board that those new arguments were waived and that, in any event, they would not change our legal conclusion that the Virginia statute was divisible. *Id.* at 254. We did not at all suggest that we could review the Board's factual findings on reconsideration because they were "collateral factual matters." *Supra*, at 10.

240, 246–247 (3d Cir. 2006); *Assaad v. Ashcroft*, 378 F.3d 471, 474–475 (5th Cir. 2004); *Pepaj v. Mukasey*, 509 F.3d 725, 726, 728 (6th Cir. 2007); *Dave v. Ashcroft*, 363 F.3d 649, 652 (7th Cir. 2004); *Hanan v. Mukasey*, 519 F.3d 760, 763 (8th Cir. 2008); *Sarmadi v. INS*, 121 F.3d 1319, 1321–1322 (9th Cir. 1997); *Infanzon v. Ashcroft*, 386 F.3d 1359, 1362 (10th Cir. 2004); *Patel v. U.S. Att'y Gen.*, 334 F.3d 1259, 1261–1262 (11th Cir. 2003). Until today, our Court has acknowledged, and followed, this uniform line of authority. *See Musangu*, 517 Fed. App. at 168 ("Circuit courts have uniformly held that the prohibition against reviewing final orders of removal when the alien is removable for having been convicted of an aggravated felony or other criminal offense extends to denial of motions to reopen."); *Rangolan*, 302 Fed. App. at 136–137 (observing that the "courts of appeals that have considered this jurisdictional issue have reached the identical conclusion" that subparagraph (C) "restricts our review of a denial of a criminal alien's motion to reopen removal proceedings to constitutional and legal questions").

No other circuit has embraced the majority's view. None of the decisions the majority cites from other circuits holds that subparagraph (C) does not apply to petitions from the denial of reconsideration or reopening or to "collateral" factual questions raised in those petitions. *Supra*, at 10, 15–16. In *Agonafer v. Sessions*, the Ninth Circuit recognized that subparagraph (C) applied to a petition from the denial of reopening but discussed two exceptions to the jurisdictional bar: the subparagraph (D) exception for constitutional claims and questions of law and an exception created by caselaw in that circuit for "a denial of CAT relief on the merits." 859 F.3d 1198, 1202 (9th Cir. 2017) (internal quotation marks omitted). Even further afield, the Fifth Circuit in *Diaz v. Sessions*

confronted a constitutional claim of ineffective assistance of counsel and determined that subparagraph (D) gave it jurisdiction over that claim, including "factual disputes that are necessary" to review the constitutional claim, but no others. 894 F.3d 222, 227 (5th Cir. 2018).

And in *Durant v. INS*, the Second Circuit squarely held that "when an alien has been ordered removed because of a conviction for one of the offenses specified in § 1252(a)(2)(C), the jurisdictional bar imposed by this section also applies to an order denying a motion to reopen removal proceedings." 393 F.3d at 114. Nothing about that decision hinged on whether the reasons for the Board's denial of reopening were related to the original removal order. To the contrary, the court "held that orders denying motions to reopen removal proceedings were 'sufficiently connected' to final orders of removal that the jurisdictional bar of 8 U.S.C. § 1252(a)(2)(C) applied" categorically to orders denying motions to reopen or reconsider. *Sepulveda v. Gonzales*, 407 F.3d 59, 64 (2d Cir. 2005) (Sotomayor, J.) (quoting *Durant*, 393 F.3d at 115). We are indeed "alone" in holding to the contrary. *Supra*, at 15.

B.

Even if the applicability of subparagraph (C)'s jurisdictional bar were an open question in this Circuit, the answer would be the same. As a reminder, the statute provides that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" certain specified crimes. 8 U.S.C. § 1252(a)(2)(C). In the INA, "jurisdiction to review 'final orders[s] of removal' . . . encompasses review of decisions refusing to reopen or reconsider such orders." *Reyes*

*Mata*, 576 U.S. at 147 (quoting 8 U.S.C. § 1252(a)(1)). As it is for the grant of jurisdiction over "final order[s] of removal" in Section 1252(a)(1), so it is for the limit on jurisdiction over "final order[s] of removal" in subparagraph (C). *See Guerrero-Lasprilla*, 140 S. Ct. at 1068. "'[I]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'" *Pereira v. Sessions*, 138 S. Ct. 2105, 2115 (2018) (quoting *Taniguichi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 571 (2012)). That "natural presumption" is warranted here, where the phrase is repeated within the same statutory subsection and in both instances describes the object of judicial review. *Env't Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (internal quotation marks omitted).

This cohesive understanding of the jurisdictional statute makes sense given the close connection between an original removal order and a subsequent motion to reopen or reconsider. After all, both motions seek to undo the prior removal order. *See* 8 U.S.C. § 1229a(c)(6) & (7); *Dada v. Mukasey*, 554 U.S. 1, 12 (2008) ("A motion to reopen . . . asks the Board to change its decision . . . ." (internal quotation marks omitted)). Unlike a CAT order, which "does not affect the validity of a final order of removal," *Nasrallah v. Barr*, 140 S. Ct. 1683, 1694 (2020), the very purpose of a motion to reopen or reconsider is to invalidate a prior removal order.

The majority's conclusion that Board decisions denying reopening or reconsideration are excluded from the phrase "final order[s] of removal" in Section 1252 not only contradicts *Reyes Mata* and *Stone*, *see supra*, at 44, it also creates uncertainty throughout the jurisdictional statute. For example, the majority assures us that courts have

jurisdiction to review petitions from decisions denying reopening or reconsideration even without the affirmative grant of jurisdiction in Section 1252(a)(1). *See supra*, at 14–15 & n.5. But *excluding* those decisions from the scope of that section has additional consequences. Section 1252(a)(1) not only grants jurisdiction, it also restricts judicial review of "a final order of removal" to "chapter 158 of Title 28, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title." 8 U.S.C. § 1252(a)(1). Under the majority's approach, those limitations apparently would not apply to judicial review of decisions denying reopening or reconsideration. Similarly, a petition for judicial review of "an order of removal under subsection (a)(1)" must be filed within 30 days of "the final order of removal." 8 U.S.C. § 1252(b)(1). If decisions denying reopening or reconsideration are not among these final orders of removal, then this "jurisdictional" filing deadline does not apply to petitions seeking review of those decisions. *Stone*, 514 U.S. at 405. The Supreme Court and our precedent, however, foreclose that interpretation. *See id.* at 405–406 (explaining that a noncitizen may seek judicial review of the denial of reconsideration within the statutory time limit); *see*, *e.g.*, *Tebonou v. Garland*, 847 Fed. App. 190, 191 (4th Cir. 2021) (dismissing petition for review of order denying motion to reopen as untimely); *Mota-Braga v. Barr*, 831 Fed. App. 629, 629 (4th Cir. 2020) (same); *Mburu v. Barr*, 812 Fed. App. 166, 166–167 (4th Cir. 2020) (same); *Martinez-Saenz v. Sessions*, 720 Fed. App. 171, 172 (4th Cir. 2018) (same); *Paglinawan v. Holder*, 564 Fed. App. 736, 737 (4th Cir. 2014) (same as to order denying motions to reopen and reconsider).

The majority invokes the "presumption favoring judicial review of administrative action," *supra*, at 14 (internal quotation marks omitted), but that presumption has no place here. "Because 'executive determinations generally are subject to judicial review,' we presume that review is available when a statute is silent." *Patel*, 142 S. Ct. at 1627 (quoting *Guerrero-Lasprilla*, 140 S. Ct. at 1069). Section 1252(a)(2)(C), however, is not silent. It expressly strips courts of jurisdiction to review any final order of removal against a criminal noncitizen, and "evidence 'drawn from the statutory scheme as a whole'" demonstrates that restriction includes orders denying reopening or reconsideration of a prior removal order. *Id.* at 1627 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).

Finally, the majority asserts that this issue concerns the separation of powers between the three branches of our federal government. It does, but not in the way the majority believes. The majority quotes *Kucana v. Holder*, expressing concern about courts "'plac[ing] in executive hands authority to remove cases from the Judiciary's domain.'" *Supra*, at 14 (quoting 558 U.S. 233, 237 (2010)). In *Kucana*, the Supreme Court addressed whether the prohibition on judicial review of discretionary action in Section 1252(a)(2)(B)(ii) applied "not only to Attorney General determinations made discretionary by statute, but also to determinations declared discretionary by the Attorney General himself through regulation." 558 U.S. at 237. Nothing about the issue before us, however,

implicates the Executive in constraining judicial review.[2] Instead, we confront a situation where Congress has by statute reduced our jurisdiction over certain immigration matters. "A statute affecting federal jurisdiction 'must be construed both with precision and with fidelity to the terms by which Congress has expressed its wishes.'" *Id.* at 252 (quoting *Cheng Fan Kwok v. INS*, 392 U.S. 206, 212 (1968)); *see also Stone*, 514 U.S. at 405. It is the majority who transgresses the separation of powers by expanding its own jurisdiction contrary to Congress's direction.

II.

Next, the majority questions which standard governs our review of the Board's decision denying equitable tolling on a motion to reopen or reconsider. A petitioner seeking equitable tolling must prove that "(1) the Government's wrongful conduct prevented the petitioner from filing a timely motion; or (2) extraordinary circumstances beyond the petitioner's control made it impossible to file within the statutory deadline." *Kuusk v. Holder*, 732 F.3d 302, 307 (4th Cir. 2013). A petitioner who relies on "extraordinary circumstances"—as Petitioner did here—"must also show that 'he has been pursuing his rights diligently.'" *Lawrence*, 826 F.3d at 204 (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

Our Court has consistently reviewed the Board's due diligence and equitable tolling determinations under a deferential abuse-of-discretion standard. Because no decision of

[2] *Kucana*'s discussion about what Congress "specified" and "left . . . where it was" in enacting IIRIRA, *supra*, at 13 (internal quotation marks omitted), addresses decisions left to Board discretion by statute versus regulation; it does not address Section 1252(a)(2)(C).

the Supreme Court or en banc opinion of this Court has disturbed that precedent, this panel is bound by it. And even if our precedent were in doubt, abuse of discretion is an appropriate standard for judicial review of this fact-specific agency determination.

A.

We review the denial of a motion to reopen or reconsider for abuse of discretion. *See* 8 C.F.R. § 1003.2(a) ("The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board, subject to the restrictions of this section."); *Cucalon v. Barr*, 958 F.3d 245, 253–254 (4th Cir. 2020) (motion to reconsider); *Mosere v. Mukasey*, 552 F.3d 397, 400 (4th Cir. 2009) (motion to reopen). In applying this standard, the Board's decision receives "extreme deference" and should be reversed "only if the decision is arbitrary, capricious, or contrary to law." *Sadhvani v. Holder*, 596 F.3d 180, 182 (4th Cir. 2009) (internal quotation marks omitted); *see also Cucalon*, 958 F.3d at 254 (same); *Mosere*, 552 F.3d at 400 (same); *Jean v. Gonzales*, 435 F.3d 475, 483 (4th Cir. 2006) ("In applying this standard, we must affirm the BIA's denial [of reconsideration] unless it lacked a rational explanation, departed from established policies, or rested on an impermissible basis." (internal quotation marks omitted)). "It need only be reasoned, not convincing." *Lawrence*, 826 F.3d at 203 (internal quotation marks omitted). Yet the Board abuses its discretion if it "fail[s] to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011).

We have applied this abuse-of-discretion standard to Board decisions denying equitable tolling. Indeed, this Court has consistently reviewed the Board's equitable tolling

decisions—including its due diligence assessments—for abuse of discretion. *See Kuusk*, 732 F.3d at 307 ("We therefore hold that the BIA did not abuse its discretion in determining that equitable tolling was not warranted here."); *see also*, *e.g.*, *Lawrence*, 826 F.3d at 203–206 (reviewing Board's diligence assessment for abuse of discretion); *Singh v. Garland*, No. 21-1662, 2022 WL 500505, at *1 (4th Cir. Feb. 18, 2022) ("We conclude that the Board did not abuse its discretion in determining that equitable tolling was unwarranted . . . ."); *Chen v. Barr*, 776 Fed. App. 801, 801–802 (4th Cir. 2019) ("We conclude that the Board did not abuse its discretion in denying Chen equitable tolling on the basis that he was not reasonably diligent . . . ."); *Kinyanjui v. Sessions*, 698 Fed. App. 753, 754 (4th Cir. 2017) (reviewing denial of equitable tolling for abuse of discretion); *Onema v. Holder*, 517 Fed. App. 139, 139 n.* (4th Cir. 2013) ("[W]e . . . find no abuse of discretion in [the Board's] alternate finding that Onema was not entitled to equitable tolling on the ground that he failed to demonstrate that he acted with due diligence."); *Urga v. Holder*, 461 Fed. App. 319, 319 (4th Cir. 2012) ("[W]e conclude that the Board did not abuse its discretion in finding that Urga was not sufficiently diligent to support equitable tolling . . . ."); *Perdomo v. Ashcroft*, 112 Fed. App. 889, 890 (4th Cir. 2004) ("The Board did not abuse its discretion in holding that . . . Perdomo did not establish the due diligence necessary to invoke" equitable tolling.).

A published decision of a panel of this Court "becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court." *Indus. TurnAround Corp. v. NLRB*, 115 F.3d 248, 254 (4th Cir. 1997) (internal quotation marks omitted). Petitioner

contends that *Guerrero-Lasprilla* requires this Court to review the Board's equitable tolling decisions de novo. But, as the majority correctly recognizes, *Guerrero-Lasprilla* decided a jurisdictional question and expressly declined to address "the proper standard for appellate review." *Guerrero-Lasprilla*, 140 S. Ct. at 1069; *see id.* ("[T]hese cases present no such question involving the standard of review."); *see also supra*, at 18–19. Nor does Petitioner or the majority identify any other Supreme Court decision that "clearly undermine[s]" our precedent applying abuse-of-discretion review. *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998). Our decisions in *Lawrence* and *Kuusk*, therefore, remain "the law in this Circuit, and we are bound to follow [them] here." *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016).

Yet the majority does not follow our precedent. It claims that our cases have produced "conflicting answers," but in support the majority cites only decisions outside the immigration context, where we reviewed de novo a district court's denial of equitable tolling as a matter of law. *Supra*, at 25.[3] When reviewing the Board's denial of equitable tolling in the context of a motion to reopen or reconsider, however, our cases have not wavered from applying abuse-of-discretion review in all circumstances. The majority attempts to distinguish *Lawrence*, but that decision straightforwardly reviewed the Board's

[3] Even those cases limited de novo review to circumstances "where the relevant facts are undisputed and the district court denied equitable tolling as a matter of law," applying abuse-of-discretion review in "all" other circumstances. *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003) (internal quotation marks omitted); *see Warfaa v. Ali*, 1 F.4th 289, 293–294 (4th Cir. 2021). The majority apparently rejects even that nuance, as it seems to require de novo review of "the BIA's decision to deny equitable tolling" in every case, without concern for whether that decision rested on factual or legal determinations. *Supra*, at 32.

equitable-tolling diligence determination for abuse of discretion. The Court first rejected the petitioner's claim that the Board articulated or applied an improperly heightened diligence standard. 826 F.3d at 204–206; *see id.* at 203 (explaining that, under abuse-of-discretion review, the Board should be reversed if its decision is "contrary to law" (internal quotation marks omitted)). The Court then dispensed with the petitioner's procedural assignments of error, concluding that the Board did not "'disregard[] important aspects of [his] claim'" or fail to provide "a sufficiently 'reasoned explanation for its decision.'" *Id.* at 206 (quoting *Tassi*, 660 F.3d at 719). That is abuse-of-discretion review, plain and simple.

Because our precedent demands that we review the Board's denial of equitable tolling in this context only for abuse of discretion, that ends the matter. Petitioner may seek en banc review to overrule this Court's prior decisions, but this panel is not at liberty to fashion a standard of review different from that dictated by our precedent.

B.

Even if our precedent were not crystal clear, a deferential standard is appropriate for reviewing the Board's equitable-tolling due-diligence determinations.[4] For starters, our only guidance from positive law suggests abuse-of-discretion review. Federal regulation provides that "[t]he decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board." 8 C.F.R. § 1003.2(a); *see Kucana*, 558 U.S. at 242 ("Mindful of the Board's 'broad discretion' in such matters, however, courts have employed a

---

[4] In his brief, the Attorney General advocates abuse-of-discretion review; he does not request any other deferential standard, such as substantial evidence or clear error.

deferential, abuse-of-discretion standard of review." (quoting *INS v. Doherty*, 502 U.S. 314, 323 (1992))).

Of course, the Board's decision whether to reopen or reconsider will be based on its resolution of the ground presented for that action. Here, the Board denied relief because Petitioner failed to demonstrate sufficient diligence to warrant equitable tolling of the limits on motions to reconsider. That issue too may be composed of subsidiary questions, which are each reviewed according to their kind. For example, the Board "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law," such as applying the wrong legal standard for diligence. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). And, if the Board's factfinding were reviewable in this case, it would be an abuse of discretion to base its ruling on a factual determination unsupported by substantial evidence. *See id.*; 8 U.S.C. § 1252(b)(4)(B). But what about the Board's decision whether the historical facts found satisfy the legal test for due diligence? This is a "mixed question of law and fact." *Guerrero-Lasprilla*, 140 S. Ct. at 1069.

Some mixed questions "call[] for review *de novo*" while others "call[] for deferential review." *Id.*; *see U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018) ("Mixed questions are not all alike."). The majority, however, takes abuse-of-discretion review off the table from the very beginning of its analysis by setting up a false dichotomy between de novo and substantial evidence review on the one hand and leaving the matter entirely to agency discretion on the other. *See supra*, at 25–27. But agency discretion is not absolute. In the context of Board reopening and reconsideration decisions, abuse-of-discretion review is deferential yet retains substantive and procedural elements:

The Board's decision must not be "arbitrary, capricious, or contrary to law," *Massis v. Mukasey*, 549 F.3d 631, 636 (4th Cir. 2008), may not rest on an impermissible basis, *Jean*, 435 F.3d at 483, must "offer a reasoned explanation," and must not "distort[] or disregard[] important aspects of the applicant's claim," *Tassi*, 660 F.3d at 719. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 814 (4th Cir. 1991), *as amended* (Jan. 7, 1992) ("'Abuse of discretion' is a legal term of art; it is not a wooden term but one of flexibility, dependent on the type of case in which it is to be applied and the posture of the case when it arises."). If the Board applies the correct law and observes these bounds on its decisionmaking, then its choice within the resulting range of permissible decisions will not be disturbed. *See generally* Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review* 83–85 (3d ed. 2018) (discussing abuse-of-discretion review of mixed questions), 259–260 (discussing arbitrary and capricious review). There is no reason abuse-of-discretion review should not be among the "deferential" standards considered for deciding this mixed question of law and fact. *Guerrero-Lasprilla*, 140 S. Ct. at 1069.

To determine the proper standard for this mixed question we ask "[w]hat is the nature of the mixed question here" and which decisionmaker "is better suited to resolve it?" *Vill. at Lakeridge*, 138 S. Ct. at 966. Mixed questions that "require courts to expound on the law" typically receive de novo review, while mixed questions that "immerse courts in case-specific factual issues" warrant deferential review. *Id.* at 967. For example, the Supreme Court held that a bankruptcy court's decision that a transaction was at arm's length when considering the facts "as a whole" was a case-specific mixed question warranting clear-error review. *Id.* at 968. The Supreme Court applied the same deferential

standard to a district court's conclusion that a country qualified as a child's habitual residence under a "totality-of-the-circumstances" test. *Monasky v. Taglieri*, 140 S. Ct. 719, 730 (2020); *see also Singh v. Rosen*, 984 F.3d 1142, 1154 (6th Cir. 2021) (reviewing these cases and concluding that whether removal would pose an "exceptional and extremely unusual hardship" to a noncitizen's family is "equally fact-bound" and so warrants "deference to the Board").[5]

The legal standard for due diligence in equitable tolling is "reasonable diligence." *Lawrence*, 826 F.3d at 204. "The inquiry is 'fact-intensive and case-specific,' requiring a court to 'assess[] the reasonableness of petitioner's actions in the context of his or her particular circumstances.'" *Id.* (quoting *Avagyan v. Holder*, 646 F.3d 672, 679 (9th Cir. 2011)); *see Guerrero-Lasprilla*, 140 S. Ct. at 1074 (Thomas, J., dissenting) ("To determine whether a litigant has exercised due diligence, judges must conduct what this Court has characterized as an 'equitable, often fact-intensive' inquiry, considering 'in detail' the unique facts of each case to decide whether a litigant's efforts were reasonable in light of his circumstances." (quoting *Holland*, 560 U.S. at 653–654)). Each diligence conclusion turns on special facts that resist generalization: what actions did the noncitizen take to pursue his rights; how frequently and over what timeframe did he act; what claims does he seek to raise; what did he know or should he have known and when; what obstacles did he face; and so forth. In other words, the decisionmaker "takes a raft of case-specific historical facts, considers them as a whole, [and] balances them one against another" to determine

[5] The majority incorrectly reports that the *Singh* court "require[d] de novo review" for this question. *Supra*, at 24.

whether a particular person made reasonably diligent efforts to pursue certain of his rights in the particular circumstances he faced. *Vill. at Lakeridge*, 138 S. Ct. at 968.[6] This is factual work.

On the other side of the coin, "a fact-intensive mixed question like due diligence . . . requires '[p]recious little' 'legal work.'" *Guerrero-Lasprilla*, 140 S. Ct. at 1076 (Thomas, J., dissenting) (quoting *Vill. at Lakeridge*, 138 S. Ct. at 968). The majority's own examples of the "legal work" to be done in deciding due diligence illustrate the point. *Supra*, at 28 (internal quotation marks omitted). For example, "what level of vigilance we can fairly expect from a noncitizen who has lived in another country for over a decade before the United States finally changed the law," *supra*, at 28, is not "a generally recurring, purely legal matter" or "readily resolved by reference to general legal principles and standards alone," *Buford v. United States*, 532 U.S. 59, 65 (2001). Rather it "grows out of, and is bounded by, case-specific detailed factual circumstances." *Id.* Moreover, the fact-bound nature of the diligence decision means even de novo review "will not much clarify legal principles or provide guidance to other courts" assessing diligence in other circumstances. *Vill. at Lakeridge*, 138 S. Ct. at 968; *see also Buford*, 532 U.S. at 65–66; *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000) ("As a discretionary doctrine that turns on the facts and circumstances of a particular case, equitable tolling does not lend itself to bright-line rules." (internal quotation marks omitted)).

---

[6] The majority offers examples of what it considers analogous determinations about reasonableness in other contexts that receive de novo review. *See supra*, at 28–29. Many of those examples arise "[i]n the constitutional realm," where, the Supreme Court tells us, "the calculus changes." *Vill. at Lakeridge*, 138 S. Ct. at 967 n.4.

All of this indicates that the agency is "better suited" than the courts of appeals to resolve the mixed question of due diligence for equitable tolling of the limits on motions to reopen and reconsider. *Vill. at Lakeridge*, 138 S. Ct. at 966. The Board also "sees many more" requests for tolling of the limits on motions to reopen and reconsider "than does an appellate judge," giving it experience that aids its decisionmaking. *Buford*, 532 U.S. at 64. And as part of the executive agency charged with interpreting and applying our Nation's immigration laws, the Board possesses expertise and special familiarity with the immigration context in which these claims arise and the general circumstances of removed noncitizens.

The majority counters that the Board itself reviews de novo equitable-tolling determinations made by immigration judges and "analogous questions." *Supra*, at 29–31 & n.9. With respect for my colleagues in the majority, it is not "difficult to understand" why we have required the Board to review such questions de novo even though that standard does not govern our own review of the Board's work. *Supra*, at 31 n.9. By regulation, the Board is authorized to review "questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo." 8 C.F.R. § 1003.1(d)(3)(ii). As we have explained, this includes, "in cases involving mixed questions of law and fact, the application of the governing legal standard to the facts found by the immigration judge." *Cruz-Quintanilla v. Whitaker*, 914 F.3d 884, 889 (4th Cir. 2019); *see Upatcha v. Sessions*, 849 F.3d 181, 184 (4th Cir. 2017). The only category excluded from this list is "purely factual finding[s]." *Cruz-Quintanilla*, 914 F.3d at 889; *see* 8 C.F.R. § 1003.1(d)(3)(i). To state the obvious, that regulation does not control our

review of Board decisions.[7] Nor is there any conflict between conceptualizing due diligence for equitable tolling as a "question of law, discretion," "judgment," or "other issue" before the Board and a mixed question of law and fact on judicial review.

Given all this, the question of a noncitizen's due diligence for equitably tolling the limits on motions to reopen or reconsider Board removal orders is a mixed question calling for deferential judicial review. It is unsurprising, then, that other courts of appeals continue to review due diligence and equitable tolling under a deferential abuse-of-discretion standard, even after *Guerrero-Lasprilla*. For example, in *Flores-Moreno v. Barr*, 971 F.3d 541 (5th Cir. 2020), the Fifth Circuit determined that it possessed jurisdiction to review the Board's equitable tolling decision as a mixed question of fact and law, *id.* at 544, and then reviewed the Board's tolling and due diligence determinations only for abuse of discretion. *See id.* at 545 ("[T]he BIA did not abuse its discretion holding that Flores-Moreno failed to pursue his rights diligently . . . ."). Other circuits have continued to do the same. *See, e.g.*, *Diarrassouba v. Garland*, No. 20-1105, 2022 WL 2517330, at *1 (2d Cir. July 7, 2022) ("The BIA did not abuse its discretion in determining that Diarrassouba did not demonstrate due diligence as required for equitable tolling."); *Zhou v. U.S. Att'y Gen.*, No. 21-1453, 2022 WL 212311, at *4 (3d Cir. Jan. 25, 2022) ("[W]e find no abuse of discretion in the BIA's conclusion that Zhou failed to show due diligence."); *Njai v. Garland*, No. 21-3764, 2022 WL 2903443, at *6 (6th Cir. July 22, 2022) ("[T]he BIA did not abuse its

---

7 As we explained in *Cruz-Quintanilla*, the standard of review there concerned "the division of labor within the agency itself." 914 F.3d at 891. Here, however, the standard of review implicates "the division of authority between the Executive and the judiciary." *Id.*

discretion when it declined Njai's equitable tolling argument . . . ."); *Hernandez-Alvarez v. Barr*, 982 F.3d 1088, 1096 (7th Cir. 2020) ("We thus cannot conclude that the Board abused its discretion in determining that equitable tolling was not warranted" for petitioner's motion to reconsider.); *Tenorio v. Garland*, No. 019-71321, 2022 WL 501567, at *1 (9th Cir. Feb. 18, 2022) ("[I]t was not an abuse of discretion for the IJ and the BIA to deny equitable tolling" on petitioner's motion to reopen.); *Berdiev v. Garland*, 13 F.4th 1125, 1134 (10th Cir. 2021) ("[T]he BIA . . . did not abuse its discretion in determining that Berdiev was not entitled to equitable tolling due to a lack of due diligence."); *Tejada-Palacios v. Att'y Gen.*, No. 21-11717, 2022 WL 168802, at *2 (11th Cir. Jan. 19, 2022) ("[T]he BIA did not abuse its discretion by concluding that equitable tolling was not warranted because Tejada-Palacios had not pursued his rights diligently.").

Until today, so did our Court. *See supra*, at 54–55. Finding that precedent amply supported—not to mention binding—I would adhere to it.

III.

We turn now to the merits of Petitioner's claim. We can assume that the Board may equitably toll the statutory time and number limits on motions to reconsider. *See* 8 U.S.C. § 1229a(c)(6). The parties agree that tolling is permissible, and we have held that the filing deadline for motions to reopen is subject to equitable tolling. *See Kuusk*, 732 F.3d at 305; 8 U.S.C. § 1229a(c)(7)(C)(i). Even assuming tolling is available, however, the Board did not abuse its discretion in denying it here.

Petitioner was deported to Jamaica in 2007. In his 2019 motion to reconsider, Petitioner stated that he did "not do anything for the previous twelve years or so" to

discover any change in the law, pursue his rights, or attempt to regain admission to the United States. A.R. 25. Petitioner explained that he and his wife, who lived in the United States, lived under "crushing poverty" and "could not on their own retain an attorney or be apprised of the latest changes in Supreme Court interpretations." A.R. 18–19. In April 2019, however, Petitioner's wife consulted an attorney and, as a result, Petitioner learned of intervening changes in the law—including the Supreme Court's April 2018 decision in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)—that meant his assault conviction no longer qualified as an aggravated felony. Counsel received Petitioner's immigration records in June 2019 and filed the motion to reconsider on his behalf in July 2019.

The Board denied equitable tolling because Petitioner did "not demonstrate[] that he acted with due diligence in pursuing his latest motion to reconsider." A.R. 4. "Assuming" Petitioner had no claim for reconsideration until *Dimaya*, the Board concluded that "the circumstances presented by [Petitioner] do not show he pursued his motion with due diligence after the Supreme Court's holding in *Sessions v. Dimaya*." A.R. 4–5.[8] The Board recounted Petitioner's argument that he and his wife were too poor to afford internet service or legal counsel and that he acted with diligence after he learned of *Dimaya* in April 2019. But the Board observed that Petitioner did "not explain[], even considering his family's low income, why they had not sought" pro bono counsel before April 2019. A.R. 5. The Board noted that Petitioner's "prior counsels were pro bono" and "no explanation

---

[8] Petitioner does not argue that the Board measured diligence from the wrong starting point in its analysis of his motion to reconsider. He does claim that the Board misidentified the date from which to measure diligence as part of denying *sua sponte* reopening, but as explained below, we lack jurisdiction to consider that claim.

[is] given why he could not have maintained contact with counsel regarding the status of the law affecting his removal," especially considering the record evidence "that his wife could assist him from the United States in maintaining contact with counsel." A.R. 5. The Board therefore concluded that Petitioner had not shown that "he acted with the reasonable diligence that would ordinarily be expected from a person in his situation." A.R. 5.

Before this Court, Petitioner principally contends that he took action after he learned of *Dimaya* (by "happenstance," as he calls it, Reply Br. 17) and it was unreasonable to expect him to make any effort to stay abreast of developments in the law. In other words, Petitioner disagrees with the very existence of the requirement to "show that 'he has been pursuing his rights diligently.'" *Lawrence*, 826 F.3d at 204 (quoting *Holland*, 560 U.S. at 649); *see Credit Suisse Secs. (USA) LLC v. Simmonds*, 566 U.S. 221, 227–229 & n.7 (2012) (reasoning that an "actual-notice rule departs from usual equitable-tolling principles"). Petitioner observes that his prior pro bono counsel was not obligated to continue the attorney-client relationship after he was deported. But that mischaracterizes the Board's opinion, which noted that Petitioner gave "no explanation" why he could not contact his prior counsel to seek information. A.R. 5. Petitioner also argues that the attorney his wife contacted in April 2019 was retained, not pro bono as the Board stated, therefore it was improper for the Board to fault him for not seeking pro bono counsel before April 2019. The attorney's status is a factual dispute we lack jurisdiction to consider. *See* 8 U.S.C. § 1252(a)(2)(C). But regardless of whether that attorney received payment, it was not improper for the Board to consider, as part of its diligence assessment, that Petitioner did not seek the advice of *any* counsel before April 2019.

Ultimately, the Board set forth and applied the correct standard, conducted an individualized inquiry that acknowledged Petitioner's evidence and considered his particular circumstances, and provided a reasoned explanation based on that evidence. Petitioner disagrees with the Board's conclusion, but he has failed to show that its decision was "arbitrary, capricious, or contrary to law." *Lawrence*, 826 F.3d at 203 (quoting *Sadhvani*, 596 F.3d at 182); *see Cucalon*, 958 F.3d at 254.

In a footnote, the majority claims it would vacate the Board's decision even under the abuse-of-discretion standard because the Board found equitable tolling warranted in a different case presenting somewhat similar facts and the agency did not supply "'reasoned decisionmaking'" for "reach[ing] the opposite result here." *Supra*, at 30 n.8 (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)). In that case, the Board found a deported noncitizen reasonably diligent where he "made repeated efforts over the course of approximately 3 years" after removal to "learn whether his proceedings could be reopened," but "abandoned these efforts" after he was told "on multiple occasions that there was nothing that could be done." *In re: Sergio Lugo-Resendez*, 2017 WL 8787197, at *3 (BIA 2017). When the noncitizen later learned that the law affecting his case had changed, he took "immediate[]" action. *Id.* Whatever the factual similarities and differences between that case and this one, the majority's reliance on *Judulang* is out of place. In *Judulang*, the Supreme Court considered whether a certain Board policy was arbitrary or capricious under the Administrative Procedure Act. *See* 565 U.S. at 52 (citing 5 U.S.C. § 706(2)(A)). Like other agencies, the Board must engage in "reasoned decisionmaking" when it creates a binding rule or policy. *Id.* at 53. The Board's

unpublished decision in *Lugo-Resendez* did not establish such a rule or policy. And reaching a different result based on different facts is not an abuse of discretion. Accordingly, I would deny the petition for review of the Board's decision denying reconsideration.

IV.

Lastly, Petitioner contends that the Board erred by declining to reopen his case *sua sponte*. Like every other circuit to have considered the issue, we have held that we lack jurisdiction to review the Board's denial of *sua sponte* reopening "because there are no meaningful standards for courts to apply in review." *Mosere*, 552 F.3d at 400 (collecting cases); *see* 5 U.S.C. § 701(a)(2); *Tamenut v. Mukasey*, 521 F.3d 1000, 1003–1005 (8th Cir. 2008) (en banc).

Petitioner argues we should recognize an exception to this settled rule for reviewing alleged legal errors. The majority does not resolve Petitioner's argument but notes that seven other circuits exercise jurisdiction to review some legal errors. *Supra*, at 40 n.10. These circuits primarily have recognized a basis for jurisdiction when the Board denies *sua sponte* reopening because it believes that some legal barrier prevents the exercise of its discretionary authority. *See Thompson v. Barr*, 959 F.3d 476, 483–484 (1st Cir. 2020); *Mahmood v. Holder*, 570 F.3d 466, 469 (2d Cir. 2009); *Pllumi v. Att'y Gen.*, 642 F.3d 155, 161–163 (3d Cir. 2011); *Rodriguez-Saragosa v. Sessions*, 904 F.3d 349, 355 (5th Cir. 2018); *Bonilla v. Lynch*, 840 F.3d 575, 588 (9th Cir. 2016); *Reyes-Vargas v. Barr*, 958 F.3d 1295, 1299–1300 (10th Cir. 2020); *but see Fuller v. Whitaker*, 914 F.3d 514, 519 (7th Cir. 2019) (claiming jurisdiction "to recognize and address constitutional transgressions and

other legal errors that the Board may have committed in disposing of" a motion to reopen *sua sponte*).[9]

Petitioner's alleged legal errors do not fall within this narrow category, so "[e]ven if we were to adopt such an exception . . . , it would not apply here." *Lawrence*, 826 F.3d at 207 n.5. Petitioner claims the Board committed two reviewable legal errors. First, citing *Matter of G-C-L-*, 23 I&N Dec. 359 (BIA 2002), the Board explained "that an alien's diligence in seeking to reopen proceedings is an appropriate consideration when determining whether to grant sua sponte reopening." A.R. 5. Petitioner argues that *Matter of G-C-L-* does not stand for that proposition. Second, Petitioner argues the Board misidentified the date from which it should measure his diligence. The Board, however, did not treat *Matter of G-C-L-* or the operative date for evaluating Petitioner's diligence as legal barriers to exercising its discretion to reopen Petitioner's removal proceedings *sua sponte*. Rather, the Board recognized its authority to *sua sponte* reopen Petitioner's case but declined to do so because Petitioner did not satisfactorily explain his lack of diligence.[10] Thus, even assuming we have limited jurisdiction to correct certain legal errors, I would dismiss this claim for lack of jurisdiction.

---

[9] Three circuits have rejected similar arguments in whole or in part. *See Rais v. Holder*, 768 F.3d 453, 464 (6th Cir. 2014); *Vue v. Barr*, 953 F.3d 1054, 1057 (8th Cir. 2020); *Butka v. Att'y Gen.*, 827 F.3d 1278, 1286 & n.7 (11th Cir. 2016); *Lenis v. Att'y Gen.*, 525 F.3d 1291, 1292–1294 (11th Cir. 2008).

[10] Indeed, Petitioner's arguments about whether and how the Board may consider diligence in deciding whether to reopen *sua sponte* appear to raise exactly the sort of questions we lack any meaningful standard to evaluate. No statute or regulation "sets forth [any] factors for the BIA to consider in deciding whether to reopen *sua sponte*, places [any] constraints on the BIA's discretion, [or] specifies [any] standards for a court to use to cabin the BIA's discretion." *Tamenut*, 521 F.3d at 1004.